IN RE PETITION OF MARY ANN PARKS TO ADOPT DENNIS LEE PARKS.

MARY ANN PARKS v. JACQUE LEE TORGERSON.

127 N. W. (2d) 548.

March 20, 1964—No. 38,911.

*Grannis & Grannis,* for appellant.
*E. Lee Armstrong,* for respondent.

ROGOSHESKE, JUSTICE.

Appeal by the natural mother of a child from an order and decree of adoption granted by the Juvenile Court of Washington County in favor of the child's stepmother.[1]

The stepmother's petition to adopt was filed with the consent of the natural father, whom she married following his divorce from the child's mother. Although the father had physical custody of the child under the decree of divorce, and the natural mother received notice of the petition and participated in the hearing thereon, she refused to consent to the adoption.

The first and determinative question presented is whether the mother had "lost custody of the child through a divorce decree" within the meaning of Minn. St. 259.24, subd. 1(b), thus authorizing the child's adoption without her consent.

Section 259.24, subd. 1, provides:

"No child shall be adopted without the consent of his parents * * * except in the following instances:

\* \* \* \* \*

"(b) *Consent shall not be required* of a parent who has abandoned the child, or *of a parent who has lost custody of the child through a divorce decree,* and upon whom notice has been served as required by section 259.26." (Italics supplied.)

The facts necessary for our consideration may be briefly stated. The child, Dennis Parks, was born in Sioux City, Iowa, on January 21, 1953. His parents are John Parks and Jacque Lee Torgerson (nee Salsness). They were married in 1951, little less than 2 years before the child's birth. At the time of their marriage in Iowa, Jacque was 16 and

---

[1] An appeal from juvenile court is expressly authorized by Minn. St. 259.32.

John was 18. When Dennis was born, John was in the military service on his way to Korea. After his birth, Jacque lived with her parents for 4 months. Then she joined a girl friend in renting an apartment, intending to seek employment and hire a professional babysitter to care for her child. This course was not dictated by economic necessity for she was receiving more than a full military allotment from John. Her parents, although disapproving of her marriage, apparently did not object to her living with them.

The day after she moved into the apartment, she became dissatisfied with the babysitter and called on Elizabeth Parks, John's mother, to care for the child. Although employed full time and living alone, Grandmother Parks willingly arranged for the care of Dennis and continued to do so until August 1955 when Dennis reached the age of 2½ years. The testimony concerning Jacque's care, attention, and visitation of Dennis, and her intentions toward him during this period, is in dispute. She insists that almost from the time Grandmother Parks accepted Dennis she was prevented from visiting and attending to his needs; John and his mother insist that she was not only guilty of improper and suspicious conduct but also of willfully neglecting the child. It was during this period that John returned from service, divorced Jacque, and both he and Jacque remarried.

On July 23, 1953, about 2 months after Grandmother Parks took Dennis, John, still in military service, instituted divorce proceedings in the Woodbury County District Court at Sioux City, Iowa. Early in June 1954, John returned to his mother's home, and about 2 weeks after his return, on June 18, 1954, he was granted a divorce by the Iowa district court. The court granted the divorce solely upon John's testimony.[2] Although Jacque was represented by counsel, she did not

---

[2]On June 19, 1954, one day after the divorce, Jacque married Verlin Torgerson, then a college student. At the time of the hearing, they had a boy, aged 7, and a girl, aged 6. They now live in Sioux City, Iowa, where Mr. Torgerson is employed as an electrical engineer.

John married the petitioner on May 3, 1955. At the time of trial, they had three boys, aged 5, 4, and 9 months, and a girl, aged 6. John has been unemployed since 1958. He is totally disabled by reason

personally appear at the hearing. A stipulation concerning the custody of Dennis (presumably prepared by counsel) was agreed upon, signed by John and Jacque, and presented at the hearing. The court found John entitled to the divorce upon the ground of cruel and inhuman treatment and approved the stipulation. No finding of custodial fitness or unfitness was specifically made. The exact language of the agreement concerning custody was incorporated into the decree of divorce and provides as follows:

"That the care, custody and control of the minor child of the parties, Dennis Lee Parks, born January 21, 1953, be granted to Plaintiff subject to the right of Defendant to call for and take said child with her away from the premises of plaintiff or any home where he may be placed by Plaintiff, during the normal waking hours of two Saturdays each month commencing with the month of June 1954 and continuing during minority. The specific Saturdays to be agreed upon which will be most convenient for both parties having consideration for the then health of said child. That if Defendant shall fail to exercise the privilege thus given in any calendar month, the day or days thus lost shall not be cumulated but if for any other reason Defendant shall be prevented or denied such rights during any calendar month such lost day or days shall be accumulated. *That after said child has attained school age Defendant shall have him in her custody for one month a year during summer vacations.*" (Italics supplied.)

Before the petition for adoption was heard on the merits, Jacque sought a writ of prohibition from this court upon the ground that the juvenile court lacked jurisdiction to proceed with the hearing. In re Petition of Parks, 262 Minn. 319, 114 N. W. (2d) 667. She claimed that she had not lost custody through the divorce decree, and therefore her consent was a jurisdictional prerequisite. In refusing to grant the writ, we held that the juvenile court, under Minn. St. 259.23, subd. 1, had jurisdiction to proceed; and further, that her claimed loss of custody was a factual issue going to the merits of the controversy and that

---

of a malignant brain tumor and his income consists of substantial monthly disability-insurance payments plus social security.

determination of such an issue was not within the scope of a writ of prohibition. Subsequently, the juvenile court granted the stepmother's petition for adoption upon a determination that it was for the child's best interest and upon a finding that the divorce decree granted no more than visitation rights to the mother and that she had lost custody by virtue of that decree.

We do not agree with the finding that the decree granted mere visitation rights and that the evidence warranted a finding that the mother lost custody through a divorce decree within the meaning of § 259.24.

■　Both the substantive and procedural phases of adoption are creatures of statute. These statutes were revised and codified in 1951 following the recommendations of a legislative interim study commission created in 1949. The provision dispensing with consent where custody is lost through divorce was not modified by the 1951 revision.[3] Numerous cases have dealt with other provisions abrogating the necessity of consent but since this provision has been part of our law we have been confronted with its application in only two cases, In re Adoption of Jaren, 223 Minn. 561, 27 N. W. (2d) 656, and In re Petition of Jordet, 248 Minn. 433, 80 N. W. (2d) 642. In both cases, the court upheld adoption decrees despite the refusal of the parent deprived of custody by the decree of divorce to consent to adoption.

In the Jaren case the child had been adopted by her stepfather after his marriage to her mother. Upon their divorce, custody of the child was first awarded to the adoptive father because the natural mother was found unfit. Subsequently, the provisions of the divorce decree concerning custody were modified and custody taken from the adoptive father on the ground that he, too, was unfit. Custody was granted to the child's maternal aunt and uncle who, with the consent of the natural mother, filed a petition to adopt. The trial court dis-

---

[3]The commission recommended that consent of natural parents not otherwise incapacitated be required in all cases except abandonment. Report of Interim Commission on Domestic Relations Problems 1951, pp. 37 and 38. However, the legislature chose to reenact the former provision which abrogated the necessity of consent "of a parent who has lost custody through a divorce decree." L. 1951, c. 508, § 4, subd. 1(b) (Minn. St. 259.24, subd. 1[b]).

missed the petition on the ground that lack of consent by the adoptive father prohibited adoption. We reversed, holding that under the evidence the child's best welfare would be served by the adoption and that the unreasonable withholding of consent by the adoptive father was not a bar. That decision did not undertake to construct the statute but rather emphasized that parental rights are subordinate to the child's welfare. The clear implication of the decision is that the adoptive father's right to custody had been extinguished or lost through a modification of the divorce decree.[4]

In the Jordet case we held valid a decree of adoption granted upon the petition of the stepfather and the natural mother, who had custody through a divorce, even though the natural father refused to consent and the divorce decree granted him visitation rights. Contrary to petitioner's primary contention, we do not believe that decision should control. Unlike this case, there the nonconsenting parent conceded in his brief that the statute permitted dispensing with his consent. His main contention was that the adoption was against the best interest of the child because it would forever sever his right of visitation and alienate his deep affection for the child. It is true that the opinion states that a mere right of visitation granted in a divorce decree "in itself is not enough to require the refusal of a petition for adoption."[5] However, a fair reading of the language indicates that the decision was primarily directed toward resolving the dispute as to what would best serve the interests of the child. In addition to the testimony bearing directly upon the disputed issue, it was also shown that subsequent to the divorce the natural father, without excuse, failed to make support payments and neglected to exercise his privilege of visitation. This showing provided the basis for concluding that the right of visitation was not a controlling factor preventing adoption where such right was no longer essential to serve the best interests of the child. The statutory requirement of consent was not urged and, except as alluded to by the dissent, no application of its provisions was attempted. Had

---

[4] See, Note, 36 Minn. L. Rev. 387.

[5] In re Petition of Jordet, 248 Minn. 433, 441, 80 N. W. (2d) 642, 647.

the authority to grant adoption in the absence of consent been challenged, the reasonable implication discernible from the decision is that it is possible for a parent to forfeit his right to custody by misconduct affecting the child's welfare subsequent to the divorce, even though the decree granting visitation rights is not modified prior to the adoption proceedings.

We have repeatedly declared that our adoption statute should be liberally construed to promote the welfare of the child "to which—in the event of conflict—every other interest must give way."[6] However, the provisions that require parental consent where the parents are known and competent are an integral part of the policy authorizing adoptions. Implicit in these provisions is a judgment by the legislature that the best interest of a child will most likely be served if parental consent is required in all cases except abandonment and loss of custody through divorce. The correlative rights and duties inherent in the parent-child relationship are natural rights of such fundamental importance that it is generally held that parents should not be deprived of them "except for grave and weighty reasons."[7] In an adoption proceeding, where an absolute severance of this relationship is sought, the consent provisions are designed to protect the natural rights of a parent to the custody, society, comfort, and services of the child. These rights were protected by the common law. Since the statute is in derogation of the common law, it is quite uniformly held that provisions abrogating the necessity of parental consent be construed strictly in favor of the parent and the preservation of the relationship.[8]

Considering the statute in its application to the situation before us,

[6]In re Adoption of Jaren, 223 Minn. 561, 569, 27 N. W. (2d) 656, 661. See, also, In re Adoption of Anderson, 235 Minn. 192, 50 N. W. (2d) 278.

[7]In re Adoption of Pratt, 219 Minn. 414, 427, 18 N. W. (2d) 147, 154. See, generally, Simpson, *The Unfit Parent: Conditions Under Which a Child May Be Adopted Without the Consent of His Parent,* 39 U. of Detroit L. J. 347.

[8]Jackson v. Spellman, 55 Nev. 174, 28 P. (2d) 125, 91 A. L. R. 1381; In re Lease, 99 Wash. 413, 169 P. 816; Matter of Cozza, 163 Cal. 514, 126 P. 161; Annotation, 47 A. L. R. 824, 825, 844.

we believe that the legislature intended that more than the mere existence of custody in one divorced parent is required to dispense with the necessity of consent by the other parent. It may be argued that the statute, read literally, abrogates the necessity of consent, even though the parent not having custody is granted some parental rights by the decree. Such construction, however, would ignore the usual manner by which custody is awarded in a divorce proceeding. In such proceeding a dispute concerning custody must be resolved by a predominant consideration of what is best for the child. True, the fitness of each parent is necessarily considered, but it is an unusual case where a parent is found unfit to have custody. Usually, considerations of the child's age and of the available facilities for the child's care and training dictate a preference for one parent, with reasonable visitation rights being accorded to the other parent. The use of the words "lost custody" indicates the intention to require more than a mere custodial preference—which itself carries no imputation of unfitness of the parent out of custody—as a basis for eliminating the requirement of consent. Such words imply not only that custody must be granted exclusively to one parent but also that the right of the other parent thereto be lost, forfeited, or extinguished.[9] The fact that abandonment is also a circumstance in which a parent's consent is not required is a persuasive indication that the legislature intended the phrase to mean an unconditional severance of custodial rights. Moreover, it is not at all uncommon that an award of custody, as here, is

---

[9]A similar construction has been made of the consent provision of a Washington statute which was somewhat similar to § 259.24, subd. 1(b). See, In re Beers' Adoption, 78 Wash. 576, 139 P. 629; In re Lease, 99 Wash. 413, 169 P. 816; In re Force, 113 Wash. 151, 193 P. 698. A new adoption act enacted by the Washington legislature in 1943 codified the judicial construction of the earlier act. Laws of Wash. 1943, c. 268, § 4(b), (Wash. Rev. Code 26.32.040[2]). See, In re Gustafson, 28 Wash. (2d) 526, 183 P. (2d) 787; In re Hope, 30 Wash. (2d) 185, 191 P. (2d) 289.

See, also, Jackson v. Spellman, 55 Nev. 174, 28 P. (2d) 125, 91 A. L. R. 1381; Rubendall v. Bisterfelt, 227 Iowa 1388, 291 N. W. 401; In re Adoption of Perkins, 242 Iowa 1374, 49 N. W. (2d) 248.

based upon an agreement of the parents. The terms of such agreements frequently are the result of the spiritual quality of parental love, a quality which transcends selfishness and the bitterness of divorce, and arise out of commendable efforts on the part of both parents to safeguard the child from the damaging effects of a broken home. It is for this reason that courts customarily encourage and readily approve such stipulations. Where such is the case and a preferential award of custody is made, it can hardly be considered consistent with the underlying spirit of the statute that a parent so deprived of custody has lost the right to veto a complete and final severance of the relationship. We are of the opinion that the legislature intended by the words of the statute before us to abrogate the necessity of consent of a divorced parent only in those cases where the divorce decree, judged as of the time of issuance, expressly or by necessary implication extinguished the right to custody.

We are not unmindful that the custody provisions of a divorce decree, like the decree itself, are subject to modification.[10] Thus, it remains possible that a right to custody, once extinguished, may be restored. Furthermore, where the decree does not extinguish the right but subsequent misconduct of the parent out of custody is such that it adversely affects the child's welfare, an unreasonable refusal to consent should not bar granting adoption. In such cases there is a forfeiture of parental rights, the preservation of which may well be inconsistent with the child's welfare. We see no reason why a claim of forfeiture cannot be raised and tried in an adoption proceeding, even though no prior action seeking modification of the divorce decree or termination of parental rights[11] had been instituted.

■ Where the custody in one parent is based upon a stipulation of the parents, the language of which is approved and incorporated into the decree, whether the right to custody of the parent not having custody has been lost, or his right to veto adoption has been extinguished, depends upon the intention of the parties. Clearly, where joint custody was intended, the statute does not permit adoption with-

[10]Minn. St. 518.18.
[11]§ 260.221.

out the consent of both parents. Where there is a failure of expression or an ambiguity of expression, it is reasonable that construction favor the preservation of parental rights inherent in the parent-child relationship. Thus, the question before us narrows to whether or not the language of the decree, viewed in the light of the record, justifies a finding that the natural mother lost her right to custody.

Although the decree did award custody to the natural father, there is no basis to find that either the parties or the court intended to divest the mother of all parental rights or to free her of parental duties. Rather, the language of the decree forecloses such a conclusion since it granted the mother not only visitation rights but "custody" for one month each year after the child reached school age. The language is that of the parties submitted through counsel, and it is reasonable to infer that the word "custody" was deliberately chosen to preserve to the mother custodial rights and duties, contemplating more than the privilege and pleasure of visitation.

Even though it may be equally reasonable to infer from the language alone that divided custody was not intended, the conduct of the mother toward Dennis is wholly consistent with her claim that she at no time intended to desert him or to surrender her right to his future custody. The evidence does show lack of judgment and indifference in placing the baby with the paternal grandmother, but immediately thereafter she did not fail to visit the child. Shortly afterward, the divorce action was filed and, because of the objections of the grandmother and the father, it became increasingly difficult for her to see the child. After the divorce was granted, she persisted in her efforts to exercise her rights preserved by the decree but she was often frustrated by the unreasonable refusal and increasing opposition of John and his mother, joined later by petitioner.[12] Accordingly, a finding that she lost custody through divorce within the meaning of the statute is unjustified.

The claim, if in fact asserted, that her activities subsequent to the

---

[12]In December 1954, after the divorce and before John's remarriage, it was necessary for Jacque to obtain a court order directing the grandmother to permit visitation.

divorce constituted misconduct affecting the welfare of the child, which would justify a finding that she forfeited her right to custody, is clearly not established by the evidence. On the contrary, during this period no imputation of unfitness or of mistreatment or neglect of the child could be sustained against either parent upon the record.

Inasmuch as the mother did not lose her right to custody through the divorce decree and did not subsequently forfeit such right, the court had no authority to grant adoption without her consent.

Reversed.