**In the Matter of the Petition of Richard L. LINEHAN and Carol S. Linehan, His Wife, to Adopt James Robert Bryant.**

No. 47892.

Supreme Court of Minnesota.

May 25, 1979.

Kempf & Miller and James D. Kempf, Bloomington, for appellants.

Cochrane & Bresnahan and R. Paul Sharood, St. Paul, for respondent.

OTIS, Justice.

This is a proceeding brought by Richard L. Linehan to adopt his stepchild, James Robert Bryant, contested by Robert Wade Bryant, the child's natural father. A bifurcated hearing was conducted by Lindsay G. Arthur, Judge of the District Court of Hennepin County, Juvenile Division.

The first hearing considered whether or not the natural father had abandoned his child or was unfit to exercise his parental rights for the foreseeable future. The court made no finding that the natural father was unfit and held that his conduct did not constitute abandonment of his child. Accordingly the petition to terminate his parental rights was denied and further proceedings on the adoption were rendered moot. The stepfather appeals from an order denying a new trial.

The issue before this court is whether it will retain the statutory test as we have construed it which terminates parental rights only where the parent is found presently unfit, or whether we fashion a new rule which permits parental rights to be terminated whenever it is in the best interests of the child to do so. We hold that the statute, our precedents, and sound public policy require that we retain our present rule.

Robert Bryant, the natural father, and Carol Linehan, the natural mother of James Bryant, were married in 1965 while residing in Missouri. James was born in March 1966 and is now 13 years old. In November 1968 Mrs. Linehan left her home in Missouri taking her son with her to her parents' residence in Minneapolis without advising her husband of her intent to do so. After discovering the departure of his wife and child on returning home from work, Robert immediately departed for Minneapolis the same night. When he arrived at the home of his wife's parents he was refused admittance. In spite of persistent efforts he was denied an opportunity to communicate with his wife or his son.

Robert testified that between 1968 and 1969 he attempted to effect a reconciliation, made numerous phone calls, and wrote several letters to his wife for that purpose. In November 1969 the parties were divorced.

The mother was awarded custody and the father granted visitation rights which were defined more specifically in September 1972 by the Missouri court at Robert's request. In May of 1971 Mrs. Linehan was married to the petitioner in these proceedings, Richard Linehan.

It is conceded that support payments were discontinued in December 1972 and that Robert's last visit was in August 1971. Nevertheless the reasons stated for the lapse in support and in visits from then until the commencement of these proceedings were persuasively presented in Robert's testimony. James had visited his father in Missouri in 1971 and his father attempted to see him again at Christmastime in 1972, exercising his newly expanded visitation rights. Those plans were totally frustrated by the child's mother who refused to cooperate in working out the arrangements. The woman to whom Robert was engaged had contracted Hodgkin's disease in March 1972 and his plans to marry her ended with her death in July. Thereafter, Robert was intermittently unemployed for as long as 18 months in one period and found himself in debt to a point where he felt unable to provide support for his son. After payments ceased, Mrs. Linehan made no demands for financial assistance from Robert. The child was adequately cared for during the time Robert was having financial and emotional problems.

In the fall of 1975 Robert began working for his father in stable employment which he continues to pursue. He is now able to support his son and wishes to do so.

Judge Arthur in his original findings stated that Robert's visitation and contact with his child had been "sketchy" but that he "has in no wise been detrimental to the child other than by his mere absence and that he might well have a beneficial effect on the child" if the child could adjust to two fathers and if Robert could build a parent-child relationship. The court further found that Robert is now capable of commencing meaningful visitation so that his child "can acquire the benefits of that relationship." The court went on to state that although it would be in the best interests of the child to have the same name as his mother and brother and have the security of having his stepfather legally responsible as a father, "it cannot be said that the natural father's rights should be cut off for the balance of the child's life."

In the order denying a new trial, Judge Arthur supplemented his findings and conclusions by stating that he was governed by the principles set forth in *McDonald v. Copperud*, 295 Minn. 440, 206 N.W.2d 551 (1973). We believe Judge Arthur was correct in reading the *McDonald* case to hold that the test in determining the question of terminating parental rights is the present ability to develop a parental relationship and not merely whether it is in the child's best interest to terminate those rights. Judge Arthur found the father's conduct "reprehensible and neglectful * * * [but] not so extreme as to constitute a final abandonment." Since the court found that the father now evinces a sincere interest in doing so "he must be given opportunity to develop a relationship in the future" with his son.

Significantly Judge Arthur made no finding that Robert, the natural father, was unfit to continue his parental rights. At most, the court found that his conduct was "reprehensible", a relatively mild rebuke which by definition means to blame, censure, chide, reprimand, or reprove.

The statute on termination of parental rights, Minn.St. 260.221, insofar as it is applicable, provides in part as follows:

"The juvenile court may, upon petition, terminate all rights of parents to a child in the following cases:

"(a) With the written consent of parents who for good cause desire to terminate their parental rights; or

"(b) If it finds that one or more of the following conditions exist:

"(1) That the parents have abandoned the child; or

"(2) That the parents have substantially and continuously or repeatedly refused to give the child necessary parental care and protection; or

"(3) That, although the parents are financially able, they have substantially and continuously neglected to provide the child with necessary subsistence, education, or other care necessary for his physical or mental health or morals or have neglected to pay for such subsistence, education or other care when legal custody is lodged with others; or

"(4) That the parents are unfit by reason of debauchery, intoxication or habitual use of narcotic drugs, or repeated lewd and lascivious behavior, or other conduct found by the court to be likely to be detrimental to the physical or mental health or morals of the child."

It should be noted that "the child's best interest" is not an independent ground for termination and that paragraph 4 is not claimed to be applicable.[1] Under the circumstances of this case, it is conceded that Robert has never "refused" to give his son care and protection within the meaning of paragraph 2 although for a period of four years he admits he failed to give financial support or exercise visitation rights. Both paragraphs 2 and 3 deal with the dependency and neglect of children as grounds for terminating parental rights. There is no claim that James was dependent or neglected since his mother was making adequate provision for him and his natural father had no reason to assume that without support from him the child would be in need. In any case, the test is whether the father is presently able and willing to assume his responsibilities and not whether he has from time to time in the past been derelict in his duties.

A brief review of our decisions lends support to Judge Arthur's decision. The *McDonald* case, on which the trial court relied, reversed a decision which terminated a mother's parental rights on the ground she was unfit because of her prior misconduct. We said that the issue was whether the evidence supports a finding of present unfitness and held that it did not. There, as here, the parent's visitation was sporadic

---

1. Consideration of the child's best interest flows, in paragraph 4, only from a finding of parental conduct detrimental to the child. Where precise conduct cannot be demonstrated, but a detrimental effect from the association nevertheless can be proved, such a showing might justify termination under paragraph 4 or other action to ameliorate the situation. Cf., footnote 2, *infra*.

but explainable. We adhered to the rule that there was a presumption that a parent is fit to have the care, custody and control of her own child and to the rule we first stated in *In re Petition of Nelson v. Bye*, 271 Minn. 194, 198, 135 N.W.2d 700, 703 (1965), that in the absence of evidence of unfitness the right of the natural parent who has lost custody of a child " 'should not be extinguished so as to prevent such parent from seeking custody in the event of death, subsequent divorce, or other changes in circumstances of the prevailing party.' " 295 Minn. 444, 206 N.W.2d 553. We stated: "Appellant's natural rights, as the mother of Troy, are of such fundamental importance that she should not be deprived of them except for 'grave and weighty reasons.' *In re Petition of Parks*, 267 Minn. 468, 474, 127 N.W.2d 548, 553 (1964)." 295 Minn. 444, 206 N.W.2d 553. In *McDonald* we held there was little, if any, evidence that the mother's conduct or condition had adversely influenced her child, a circumstance which applies as well to the instant case. We then concluded that in the best interests of the child a new trial should be granted so that the mother's "present situation and that of her child may be more intensively appraised by the juvenile court." 295 Minn. 444, 206 N.W.2d 554.

In *Parks* we had stated that the statute was in derogation of the common law and that its provisions abrogating the necessity for parental consent should be strictly construed in favor of the parent and the preservation of that relationship. 267 Minn. 474, 127 N.W.2d 553.

Subsequently we noted in *In re Barron*, 268 Minn. 48, 54, 127 N.W.2d 702, 707 (1964), that in spite of prior neglect which was substantial, and past conduct detrimental to a child's welfare, an assumption that a parent's claimed rehabilitation was only temporary and unreliable would be pure speculation. We said: "Implicit in the statutes is the policy that whenever possible the family relationship should be strengthened

and preserved." 268 Minn. 53, 127 N.W.2d 706.

None of our cases authorizes termination of parental rights in the absence of a finding of consent, dependency, neglect or unfitness.[2] A case with nearly identical facts is *Eggert v. Van De Weghe*, 279 Minn. 31, 155 N.W.2d 454 (1967). There a stepfather sought to adopt his wife's child over the objection of the natural father. A county welfare agency investigated the stepfather's home and recommended adoption as serving the child's best interests. There, as here, there was evidence that the child's name change was desirable in order to conform to the family name of his mother and stepfather. Four years earlier the natural father had relinquished his right to visitation and the natural mother her right to support. In that four-year interval the natural father made no attempt to make support payments, made no direct inquiries concerning his son's welfare nor any direct attempt to contact his son. The reason the natural father assigned for his neglect was that he was under the misapprehension such activities were prohibited by the court and that his overtures would be rebuffed by the child's mother, which had been his prior experience. He believed that "attempts to reestablish contact were unrealistic and would not serve the child's best interests." 279 Minn. 35, 155 N.W.2d 457.

In *Eggert* the juvenile court found that adoption by the stepfather would serve the child's best interests and accordingly granted the petition. We reversed, having previously held that the adoption statute requiring consent where custody had not been lost by divorce decree meant "that the consent of a natural parent * * * may be dispensed with only in those cases where the issue of the alleged unfitness underlying his parental rights is raised and adjudicated in the divorce proceeding." 279 Minn. 35, 155 N.W.2d 457, citing, inter alia, *In re Petition of Nelson v. Bye, supra*. We held in *Eggert* :

**2.** Two of our cases use "best interests" language but do not apply that test to terminate parental rights. *Matter of Welfare of Rosen-*

*bloom*, 266 N.W.2d 888 (Minn. 1978); *Matter of Welfare of Kidd*, 261 N.W.2d 833 (Minn. 1978).

" * * * It is not sufficient to determine merely that the best interests of the child would be served by adoption. The 'best interests of the child' is an imprecise standard. The application of this standard alone to determine parental fitness ignores the fundamental importance of the rights of natural parents and the statutory standards required to be met for a complete and permanent severance of such rights." 279 Minn. 37, 155 N.W.2d 459.

Our decision in the *Eggert* case mandates affirmance in these proceedings.

There we concluded:

" * * * [O]ur three most recent cases emphasize our adherence to the policy of protecting the rights of parents who do not have custody in controversies involving termination of the parent-child relationship. In adoption proceedings it is in the best interests of the child that the parental rights of the parent out of custody not be terminated unless parental unfitness is found. A determination that the best welfare of the child would be served by his remaining in petitioners' home does not alone justify granting adoption without the consent of the parent not having custody." 279 Minn. 38, 155 N.W.2d 459.

Since in *Eggert* the mother, on becoming disabled, made no requests for the natural father to assume the care and protection of his child, his failure to seek custody did not "bespeak parental neglect, mistreatment, or abandonment of the character condemned by the statute and required for the termination of parental rights." 279 Minn. 38, 155 N.W.2d 459. Unless we are now to overrule *Eggert*, it is difficult to conceive of authority more precisely in point. No case has been cited nor any called to our attention where a natural father has been deprived of his parental rights without consent in the absence of a finding that he is unfit to exercise those rights.

If we are to hold that whenever a divorced mother remarries it is in the best interests of children in her custody to sever the parental rights of the natural father in order to permit them to assume their stepfather's name and to obligate him for their support, there are few fathers who will relinquish custody without a bitter struggle to prevent their relationship with their children from being terminated by a subsequent marriage between the mother and a stranger. Equally important, the prospect of losing both natural parents on the death of one of them is alien to the values we place on preserving the relationship of parent and child.

The derelictions of this father stemmed from frustrations which were in part occasioned by the mother's discouraging his attempts for visitation as well as by the financial and emotional problems with which he was confronted. Apart from his passive neglect there is no evidence that he has been guilty of any conduct which reflects adversely on his character. He is not here seeking custody of his son or any disruption of the present relationship between his child and the household in which his son lives. He is anxious only to resume visitation rights and assume the role of a parent. He should be given that opportunity.

Affirmed.

TODD, Justice (concurring specially).

While I have no specific objection to the result reached in the instant case, the facts as presented would appear to warrant a reconsideration of the standard retained by the majority opinion. An examination of the parent's present fitness to function effectively as a parent was wholly proper in the distinguishable cases relied upon by the majority opinion; namely *McDonald v. Copperud*, 295 Minn. 440, 206 N.W.2d 551 (1973), and *In re Petition of Eggert*, 279 Minn. 31, 155 N.W.2d 454 (1967).

However, in unusual cases where a preliminary determination has been made that the natural father's lack of physical, financial, or emotional conduct for a period of 5 years is "reprehensible," that conduct should not be examined in the isolated context of that parent's fitness to reassume the active role of parenting. Rather, at some point, the parent's right to that legal status

must be balanced with the right of a child to receive a positive benefit from the relationship.

The majority opinion illuminates many of the factors which may perhaps explain the natural father's absence from the life of his child; however, the record does not fully explain the parent's failure, after the remedy of many of the circumstances, to attempt to reestablish his relationship with his son. The record does support the conclusion that any professed interest in maintaining the legal status was only in response to judicial efforts of the child's stepfather to assume that legal role.

It may well be that it is in the best interest of the child to establish a permanent relationship with his stepfather, a person with whom he has lived since 1971, whom he refers to as "Daddy" and to whom he has looked for his sole emotional and financial support during the period of his absence from his father.

The majority opinion seems to indicate that we are left with the choice of either retaining the present standard or abandoning it in favor of a new rule "which permits parental rights to be terminated whenever it is in the best interests of the child to do so." Overriding policy and statutory considerations discussed by the majority do indeed appear to preclude that approach. Nonetheless, it would seem of optimum benefit to all parties to require the court to examine the statutory and decisional criteria in conjunction with the best interests of the child in extraordinary situations such as that presented herein. In that manner, the traditional concepts are not eroded, but are instead strengthened by that totality of the approach.