**In re D.J.A. a/k/a M.R.E., A Minor.**

No. S–3179.

Supreme Court of Alaska.

June 1, 1990.

Phyllis A. Shepherd, Anchorage, for appellant.

Millard F. Ingraham, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

### I. INTRODUCTION.

P.E., the natural mother of D.J.A., appeals the superior court's judgment granting L.A.'s petition for adoption. P.E.'s main contention in this appeal is that the superior court erred in holding that she willfully, without justifiable cause, failed to communicate meaningfully with D.J.A. for at least one year. We reverse.

### II. FACTS AND PROCEEDINGS.

D.J.A. was born on April 17, 1984, the natural son of D.A., his father, and P.E., his mother. D.A. and P.E. were not married. In September 1985, P.E. took D.J.A. to California to visit relatives. On September 28, 1985, D.J.A. (then known as M.R. E.), sixteen months old, was found by a motorist wandering alone in a Visalia, California street. D.A. went to California and acquired custody of D.J.A. from the California authorities.

D.A. returned to Alaska with D.J.A. and commenced an action for custody of the child. Thereafter, the superior court conducted a trial without a jury. On October 3, 1986, the court entered Findings of Fact and Conclusions of Law and a Decree awarding sole custody of D.J.A. to D.A. In finding of fact no. IX, the superior court stated:

> From [P.E.'s] behavior, as observed by this Court, and testified to by [D.A.], his parents and other witnesses, including [P.E.'s] mother and brother, it is apparent that [P.E.'s] behavior is the result of a mental illness. It would appear that she is in need of long term psychotherapy. Any future visitation with her child should be conditioned upon significant proof of improvement in her mental condition and social behavior which would demonstrate the presence of self-control and the capacity to meet the needs of others, particularly those of her child.

Based in part on this finding, the superior court decreed:

> [P.E.] will not have visitation for a significant period of time to be of at least six months in duration before the Court considers any new application on her part to permit visitation.

P.E. did not appeal the custody decree of the superior court.

Meanwhile, in August 1986, D.A. married L.A. On October 16, 1987, a little more than a year after the superior court had entered its decree awarding custody of D.J.A. to D.A., L.A. filed a Petition for Adoption. In her petition, L.A. alleged that P.E.'s consent to the adoption is not required under AS 25.23.050(a)(2)(A) because "[f]or a period in excess of one (1) year the natural mother has failed in any

way to communicate meaningfully with her minor child."

P.E. responded by filing a motion for summary judgment. In her motion, P.E. did not contend that she had had meaningful communication with D.J.A.; rather, P.E. maintained that she had justifiable cause for not communicating with her son. The superior court subsequently denied P.E.'s motion for summary judgment.

It is undisputed that there has been no oral communication between P.E. and D.J.A. following a supervised visitation in July 1986. L.A. testified that the only communication between P.E. and D.J.A. was in April of 1988 when P.E. sent balloons to D.J.A. at his day care center with a card that read "Happy Birthday Cookie." P.E., however, testified that she also sent D.J.A. a musical Snoopy birthday card in April of 1987.

P.E. had telephone contact with D.A. after July 1986. In November 1986 and February 1987, P.E. called D.A. and threatened to kill him. In March 1987 P.E. called again, but D.A. hung up the phone as soon as he identified P.E. as the caller. At no time during this period did P.E. ask to speak to D.J.A. or ask how D.J.A. was doing. P.E. never communicated with L.A. until after the petition for adoption was filed in October 1987.

P.E. also had telephone contact with S.A. and C.A., D.A.'s parents. In October 1986, following the custody hearing, P.E. called S.A. and threatened to kill her. In March 1987, P.E. called again, screaming. However, P.E. never asked S.A. to relay a message to D.J.A. In November 1987, P.E. called C.A. and asked why C.A. was trying to take custody of her son. P.E. never asked C.A. about D.J.A. and never asked C.A. to deliver a message to D.J.A.

P.E. spoke frequently with J.H., a social worker who served as D.J.A.'s guardian ad litem during the custody trial, after October 1986. P.E. called J.H. almost every week for several months following entry of the custody decree. J.H. testified that P.E. wanted him to help her keep track of how D.J.A. was·doing, and to help her get D.J.A. back. J.H. recalled that P.E. once asked him to tell D.J.A. that she loved him or that she was concerned about him.[1]

In its findings of fact the superior court stated that in "failing to contact the child [D.J.A.] for a period in excess of one year, [P.E.] has wilfully failed to communicate without justifiable cause with [D.J.A.] and therefore her consent to this adoption can be dispensed with."

P.E. raises three issues on appeal. First, P.E. claims that the superior court erred in denying her motion in limine regarding evidence of her mental condition adduced in the custody case. Second, P.E. claims that the superior court erred in overruling several of her evidentiary objections. Third, P.E. claims that the superior court erred in its holding that her failure to communicate was without justifiable cause.

## III. DID THE SUPERIOR COURT ERR IN DENYING P.E.'S MOTION IN LIMINE?

P.E.'s motion in limine requested "an order requiring that all the evidence of the previous court case on custody ..., all evidence on psychological issues of the natural mother and all evidence which does not directly deal with the issue of waiver of consent to this adoption be excluded from evidence." P.E. argues on appeal that the superior court erred in admitting evidence of P.E.'s psychological condition, specifically, Dr. H.'s deposition. There is, however, nothing in the record to suggest that the superior court considered any evidence produced in the 1986 custody case.[2] More-

---

1. P.E. also made a number of calls to M.W., the owner-operator of D.J.A's day care center. On one occasion after the custody hearing, P.E. called M.W. twenty-five times in a half-hour period, and another day P.E. called M.W. ten times in a fifteen minute period. M.W. testified that P.E. called "to obtain some kind of contact with the child."

2. The standard of review of a trial court's decision on the admissibility of evidence is whether the trial court committed an "abuse of discretion." *Hutchins v. Schwartz,* 724 P.2d 1194, 1197 (Alaska 1986). This court "will find that a trial court abused its discretion only 'when it is left with a definite and firm conviction, after reviewing the whole record, that the trial court

over, in making her case that she had justifiable cause for not communicating with D.J.A., P.E. opened the door to the question of P.E.'s attempts to obtain psychotherapy.[3]  L.A. must be permitted to rebut P.E.'s evidence.[4]  Therefore, we hold that the superior court did not err in denying P.E.'s motion in limine.

## IV.  DID THE SUPERIOR COURT ERR IN OVERRULING P.E.'s EVIDENTIARY OBJECTIONS?

■  P.E. contends that the superior court erred in overruling three of her evidentiary objections.  First, P.E. objected below to L.A.'s competency to testify as to telephone conversations that D.A. had with P.E.  The superior court ruled that L.A. could "testify about what she knows." L.A. then testified that the calls were "death threats" or were "threatening calls."  Our review of the record in this case convinces us that even if the superior court's rulings were erroneous, the admission of L.A.'s testimony was at most cumulative, and thus not prejudicial error.[5]

Second, P.E. objected below to the court's ruling permitting J.H. to render an opinion as to P.E.'s psychological improvement.  L.A.'s counsel asked J.H., "In your opinion was there ever[ ] any improvement in [P.E.'s] thinking or perception of [her] problems over a period of time?"  J.H. stated in reply that P.E.'s mental condition

was uneven, and that there was no significant improvement.

■  While J.H. is not a therapist, he is a social worker with several years experience.  After the 1986 custody trial, J.H. had ample opportunity to observe P.E.'s condition.  J.H. saw her weekly for several months.  Therefore, J.H.'s testimony was arguably admissible as a lay opinion pursuant to Alaska Rule of Evidence 701, since it was rationally based upon his own experiences and was helpful to a clear understanding of his testimony.[6]  However, even assuming the superior court erred in rejecting P.E.'s objection to this testimony, we hold that such error would be harmless. Insofar as P.E.'s perception of her problems was relevant to the issues in the adoption proceeding, there was extensive testimony on this matter from Dr. H. which was admitted without objection, so J.H.'s testimony on the point was cumulative.

■  Third, P.E. objected to a leading question by L.A.'s counsel directed to J.H. L.A.'s counsel asked, "[w]ould it be fair to characterize your contacts with [P.E.] as being conversations in which she was more concerned with herself and her own needs than with what [D.J.A.'s] needs might be at the particular time she was talking to you?"  Although we agree that this question was clearly leading, after careful consideration of the record before us, we are

---

3. P.E. relies in part on the fact that she could not obtain visitation with D.J.A. unless she entered long-term psychotherapy.  P.E. testified on direct examination concerning her attempts to receive counseling, and assigns these attempts and their failures as justifiable cause for failing to communicate with D.J.A.

erred in its ruling.' " *Dura Corp. v. Harned*, 703 P.2d 396, 409 (Alaska 1985) (citation omitted). However, if this court finds that the error did not affect the substantial rights of the parties, the error is harmless and will not support reversal of the judgment of the trial court.  Alaska R.Civ.P. 61; *Martinez v. Bullock*, 535 P.2d 1200, 1206 (Alaska 1975).  In determining whether an erroneous evidentiary ruling was harmless, the court shall put itself in the position of the jury to determine whether, as reasonable persons, any error committed probably affected their verdict. *Poulin v. Zartman*, 542 P.2d 251, 261 (Alaska 1975) (citing *Love v. State*, 457 P.2d 622, 631 n. 15 (Alaska 1969)).

4. L.A. has the burden of proving by clear and convincing evidence that P.E.'s failure to communicate meaningfully with D.J.A. was not justified.  *D.L.J. v. W.D.R.*, 635 P.2d 834, 838 (Alaska 1981).

5. *See Fairbanks North Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1035 (Alaska 1986) ("We believe the evidence contained in the disputed depositions was cumulative, thus its admission was harmless error.").

6. Alaska Rule of Evidence 701 provides:
   *Opinion Testimony by Lay Witnesses.*  If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

convinced this error was harmless; P.E.'s rights could not have been adversely affected by the ruling permitting this question.

## V. DID THE SUPERIOR COURT ERR IN FINDING THAT P.E. HAD FAILED SIGNIFICANTLY AND WITHOUT JUSTIFIABLE CAUSE TO COMMUNICATE MEANINGFULLY WITH D.J.A.?

P.E. also argues that the trial court erred in its finding that she had failed significantly and without justifiable cause to communicate with D.J.A.[7] The applicable legal standard requires us to determine whether the superior court's holding that P.E. did not have justifiable cause for her failure meaningfully to communicate with D.J.A. is clearly erroneous.[8]

We have construed AS 25.23.050 strictly, and with an eye to protecting the rights of natural parents.[9] The burden of proof articulated in our decisions construing AS 25.23.050 reflects this strict construction. Pursuant to our decision in *D.L.J. v. W.D.R.*, 635 P.2d 834 (Alaska 1981), L.A., as the adoptive parent, has the burden of proving by clear and convincing evidence that P.E. failed significantly to communicate with D.J.A. for a period of at least one year. *Id.* at 837. If L.A. meets this burden, the burden of production then shifts to P.E. to come forward with evidence of a justifiable cause for the failure to communicate. *Id.* If P.E. meets this burden of production, L.A. must then prove by clear and convincing evidence that P.E.'s failure to communicate was without justifiable cause. *Id.*

■ We conclude that the superior court erred in holding that L.A. proved by clear and convincing evidence that P.E. lacked legally sufficient justification for her failure to communicate with D.J.A.[10] P.E. raises several justifications for her failure to communicate. Most significant is her claim that she "was effectively denied communication with her child for at least 6 months" as a consequence of the superior court's decree in the custody case which denied her visitation rights.[11]

7. Alaska Statute 25.23.050 provides, in relevant part:
   consent to adoption is not required of ... (2) a parent of a child in the custody of another, if the parent for a period of at least one year failed significantly without justifiable cause, including but not limited to indigency, (A) to communicate meaningfully with the child[.]

8. The superior court's findings of fact are governed by the clearly erroneous standard of review. Alaska R.Civ.P. 52(a); *see also In re J.J.J.*, 718 P.2d 948, 957 (Alaska 1986). A clearly erroneous finding is "one which leaves the supreme court with a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding." *Sumner v. Fel-Air, Inc.*, 680 P.2d 1109, 1112 n. 7 (Alaska 1984).

9. In *D.A. v. D.R.L.*, 727 P.2d 768 (Alaska 1986), we observed:
   In past decisions this court has strictly construed these statutory consent provisions, in order to protect the rights of the natural parent. *S.M.K. v. R.G.G.*, 702 P.2d 620, 623 (Alaska 1985); *R.N.T. v. J.R.G.*, 666 P.2d 1036, 1040 (Alaska 1983); *D.L.J. v. W.D.R.*, 635 P.2d 834, 837 (Alaska 1981); *[In re] Adoption of K.M.M.*, 611 P.2d 84, 87–88 (Alaska 1980). We also have read the term "meaningful communication" broadly. *See K.M.M.*, 611 P.2d at 88. *[But see] In re J.J.J.*, 718 P.2d 948 (Alaska 1986). Thus, in circumstances where the child is too young to read or communicate over the telephone, we have relaxed the requirement of meaningful communication under the "without justifiable cause" language of AS 25.23.050(a)(2)(A). *S.M.K.*, 702 P.2d at 624.
   *Id.* at 770.

10. In *Delgado v. Fawcett*, 515 P.2d 710 (Alaska 1973), we agreed with the Supreme Court of Minnesota's observation that:
    The correlative rights and duties inherent in the parent-child relationship are natural rights of such fundamental importance that it is generally held that parents should not be deprived of them "except for grave and weighty reasons." In an adoption proceeding, where an absolute severance of this relationship is sought, the consent provisions are designed to protect the natural rights of a parent to the custody, society, comfort and services of the child.
    *Id.* at 712 (quoting *In re Parks' Petition*, 267 Minn. 468, 127 N.W.2d 548, 553 (Minn.1964)) (footnote omitted).

11. P.E. also contends that (1) she was effectively denied communication because D.A.'s family and others prevented her access to D.J.A., and (2) any communication from July 1986 until October 1987 would have been futile because of D.J.A.'s young age and difficulty speaking.

The superior court's decree in the custody case provided in part:

2. Respondent [P.E.] will not have visitation for a significant period of time to *be of at least six months in duration* before the Court considers any new application on her part to permit visitation.

3. Any future visitation with the minor child will be conditioned upon proof of significant improvement in [P.E.'s] mental condition and social behavior which would demonstrate the presence of self-control and the capacity to meet the needs of others, particularly her child.

(Emphasis added.)

In its findings of fact in the adoption proceeding, the superior court found that

[P.E.] has not complied with the conditions set out in the court's order of October 14, 1988, whereby the court found that '[P.E.'s] behavior was the result of a mental illness and that it would appear that she is in need of long-term psychotherapy.' She has failed to obtain long term psychotherapy. This noncompliance has been deliberate and wilful.[12]

In its conclusions of law in the adoption proceeding the superior court held:

2. The natural mother, [P.E.], did not comply with this court's order that she obtain long-term psychotherapy; she has not seen or communicated with [D.J.A.] and the parent/child bond has been destroyed.

3. The natural mother, through her wilful conduct in failing to obtain psychotherapy, failing to move to reinstate visitation and failing to contact the child [D.J.A.] for a period in excess of one year, has wilfully failed to communicate without justifiable cause with [D.J.A.] and therefore her consent to this adoption can be dispensed with.

J.H. testified that after the entry of the custody decree P.E. called weekly for several months to keep track of how her child was doing and that she had lots of questions as to how the child was progressing. J.H. further stated that initially P.E. did not understand why she was not being allowed to see her child; that she claimed nobody had explained to her what she needed to do in order to get to see her child; that this was "kind of a continuing theme"; and that P.E. "seemed to have real difficulty understanding ... the nature of her difficulties."[13]

In regard to the impact that the superior court's custody decree had on P.E. during the relevant one year period (July 1986 to October 1987), P.E. testified in part as follows:

Q. Did you find that the decree of October 1986 was at least—was somewhat of an obstacle to you?

A. I—I wouldn't say the decree itself was an obstacle. It was following through with the decree. It was—I tried hard....

. . . .

A. I—I said in black and white reading it it's—it's not difficult but when I actually—when I actually attempted

---

12. In connection with this finding, the superior court wrote:

[Dr. H.], a licensed clinical psychologist, testified by deposition that he had evaluated [P.E.] in November and December of 1985 and in June of 1986 prior to the custody trial. He found then that [P.E.] suffered from a borderline personality disorder with paranoid features. In September of 1988 he performed a Review of Treatment Materials of [P.E.] for the final adoption hearing. The treatment materials he reviewed included records from the Alaska Psychiatric Institute and South Central Counseling Center. From his review he found that there had been no change in the level of personality functioning of [P.E.], that his diagnosis remained the same and his prognosis remained guarded. [Dr. H.] testified that, for a borderline personality to significantly improve, three to five years of psychotherapy with a qualified therapist is necessary and that the intermittent therapy [P.E.] had received from one psychiatrist and two psychologists between October 1986 and September 1988 had not helped to improve her mental and emotional functioning. [Dr. H.] also testified that he felt [P.E.] was unable to use psychotherapy beneficially and would be unlikely to do so in the future.

13. J.H. further testified that in the absence of any advice from her attorney, he gave P.E. a set of guidelines which in part informed P.E. that the superior court had certain expectations of her and that if she wanted to re-establish contact and visitation with her child, she needed to make some significant changes and show that she had been involved in therapy.

to follow through with what it said there was many, many obstacles and there was a lot of confusion as to what I have already accomplished whether it even follows—I have accomplished what the decree has ordered me to do, with all the attempts that I've—and efforts that I have made.

Based on this evidence, we conclude that the superior court erred in holding that L.A. proved by clear and convincing evidence that P.E. lacked justifiable cause for her failure meaningfully to communicate with D.J.A. during the year in question. In particular, we reach this conclusion on the basis of the following facts: throughout the entire period in question P.E. suffered under a disturbed mental-emotional state; [14] the superior court's custody decree denied P.E. any visitation rights with D.J.A. for a period of at least six months; [15] the superior court's custody decree is ambiguous as to the requisite therapeutic treatment P.E. had to undergo before she could obtain visitation rights with D.J.A.; [16] and P.E. was in fact confused as to what treatment she had to undergo and what she had to demonstrate in order to lift the court imposed visitation ban.

It is apparent that P.E.'s mental and emotional condition and lack of legal sophistication hampered her efforts throughout the year in question to communicate with and to obtain visitation rights with D.J.A. Given this record, and the rules of construction we alluded to in *D.A. v. D.R.L.*, 727 P.2d at 770, we conclude that the superior court erred in holding that the requirement of P.E.'s consent to the adoption of D.J.A. had been forfeited. In short, L.A. has not proved by clear and convincing evidence that P.E. lacked justifiable cause for her failure to communicate with D.J.A.

REVERSED.

MOORE, Justice, with whom COMPTON, Justice, joins, dissenting.

Under Alaska law, the consent of the natural parent to an adoption is not an absolute prerequisite. A natural parent's consent to the adoption is not required, for example, if she fails to communicate meaningfully with her child for at least one year.[1] Implicit in AS 25.23.050 is "the legislative judgment that a parent who has manifested an inability or unwillingness to discharge the rights and duties of a parent shall be considered to have forfeited his right to obstruct an adoption." *Delgado v. Fawcett*, 515 P.2d 710, 713 (Alaska 1973). I agree with the court that AS 25.23.050 must be construed to protect the rights of natural parents. As we held in *Delgado*, parents should not be deprived of their rights to their child "except for grave and weighty reasons." 515 P.2d at 712. This is why a custodial parent must prove by clear and convincing evidence that the elements of AS 25.23.050(a)(2)(A) are satisfied. *D.L.J. v. W.D.R.*, 635 P.2d 834, 838 (Alaska 1981). At the same time, we must not lose sight of the fact that the primary goal of AS 25.23.050 is to maximize the potential for a stable, secure family relationship for the child.

Although we have held that the best interests of a particular child are not relevant to the superior court's determination of whether his natural parent's rights can be terminated without consent, *D.L.J.*, 635 P.2d at 838, that does not mean that we must ignore the interests of children in

---

**14.** The superior court was persuaded and found that P.E. had serious, ongoing mental or emotional problems. Her phone calls to D.A. and his parents, alluded to at the outset, are reflective of P.E.'s disturbed mental-emotional state.

**15.** Regarding the possibility of writing to D.J.A., P.E. testified that she knew D.A. would not read D.J.A. anything she wrote to the child.

**16.** Throughout the period in question, P.E. did seek and obtain medical assistance. She com-

mitted herself to the Alaska Psychiatric Institute for a period of five months. While institutionalized, P.E. was able to obtain day passes and work outside the hospital.

**1.** AS 25.23.050(a)(2)(A). Consent also is not required of a parent who has abandoned a child for at least six months or of a parent who fails to provide for the care and support of a child as required by law or judicial decree. AS 25.23.-050(a)(1); AS 25.23.050(a)(2)(B).

interpreting AS 25.23.050. In fact, in interpreting AS 25.23.050 we have recognized the interests of children in three ways. First, we have held that "in order for a noncustodial parent to block a stepparent adoption, he or she must have maintained *meaningful* contact with a child...." *In re J.J.J.*, 718 P.2d 948, 953 (Alaska 1986). As Chief Justice Matthews has written, "[i]n distinguishing between meaningful and non-meaningful communications it is evident that the legislature intended that the mere symbolic observation of birthdays and holidays would not be enough to maintain the rights of parenthood." *In re K.M.M.*, 611 P.2d 84, 89 (Alaska 1980) (Matthews, J., dissenting). Second, in cases where the noncustodial parent has failed to communicate meaningfully with her child, such a failure is justified only if she was prevented from communicating by circumstances beyond her control. *J.J.J.*, 718 P.2d at 953. Third, even when prevented from communicating by such circumstances, a noncustodial parent still has the duty to make reasonable efforts to communicate with her child. *In re B.S.L.*, 779 P.2d 1222, 1224 (Alaska 1989). A noncustodial parent's failure to communicate meaningfully is justified "only if her efforts to communicate were objectively reasonable in light of the existing circumstances." *Id.*

The court holds that the superior court clearly erred in finding that P.E. lacked justifiable cause for failing to communicate with D.J.A. As the court notes, a clearly erroneous finding is "one which leaves [it] with a definite and firm conviction on the basis of the entire record that a mistake has been made, although there may be evidence to support the finding." *Frontier Saloon, Inc. v. Short*, 557 P.2d 779, 781–82 (Alaska 1976) (per curiam). The court identifies two facts that it believes gives rise to a definite and firm conviction that the superior court erred in concluding that P.E.

lacked justifiable cause for failing to communicate with D.J.A.: (1) P.E. was denied visitation rights with D.J.A. for at least six months by court order;[2] and (2) P.E. suffered under a disturbed mental-emotional condition. *Supra* p. 1039. In treating the court decree as justifiable cause, the court ignores the two requirements necessary to transform an obstacle to communication into a justification for a failure to communicate. In treating both the decree and P.E.'s mental condition as justifiable cause, the court fails to give due regard to facts supportive of the superior court's determination and inappropriately emphasizes facts supportive of its result. The record in this case does not even come close to giving rise to the definite and firm conviction that a mistake has been made that is required to reverse the superior court's finding. Effectively, the court has placed the natural parent's interests over that of the child. For this reason, I respectfully dissent.

The court finds most persuasive P.E.'s claim that she "was effectively denied communication with her child for at least 6 months" because the superior court decree denied her visitation rights. *Supra* pp. 1037–1038. By its terms, the decree was not an obstacle to communication at all since it denied P.E. *visitation* rights, not communication rights. The court's conclusion that the decree constituted a justification for failing to communicate appears to be based on the theory that P.E. was confused about the effect of the decree. Even if P.E.'s alleged confusion might be sufficient to justify her failure to communicate, the court cites no evidence indicating that she was confused.[3] In fact, P.E. admitted that she knew that she could communicate with D.J.A. without violating the decree. At trial, P.E.'s counsel asked her "[w]ere you trying to communicate and learn about

---

**2.** The court also finds that the court order was ambiguous and P.E. was confused as to the requisite therapy she had to undergo before she could reinstate her visitation rights. *Supra* p. 1039. These facts are irrelevant to the question whether the court order constituted a justification for P.E.'s failure to *communicate* with D.J.A.

**3.** The court cites P.E.'s testimony that she was confused as to what she had to do in order to reinstate her *visitation* privileges. This confusion is no justification for P.E.'s failure to communicate with her child.

your son without violating the decree?" P.E. answered, "[y]es, I have." As the court points out, P.E. made numerous telephone calls to almost every person who had contact with D.J.A. to find out about him. *Supra* p. 1035. Yet at no time did she ever ask any of them to let her talk to D.J.A. and only once did she ask anyone to relay a message to him. *Id.* Since the record shows that P.E. was under no misconception about the effect of the decree with regard to communication, the decree did not prevent her from communicating with D.J.A.

Although the custody decree may have limited the means by which P.E. was able to communicate with D.J.A., the decree cannot constitute a justification for P.E.'s absolute failure to communicate for two reasons. First, P.E.'s loss of visitation rights was not the result of circumstances beyond her control. *J.J.J.*, 718 P.2d at 953. In D.A.'s custody action, the superior court denied P.E. visitation rights because of her improper and illegal conduct.[4] In fact, D.A. commenced the custody action only after P.E. had abandoned D.J.A. in Visalia, California. If P.E. had not abandoned her role as D.J.A.'s parent, she might not have lost visitation rights to D.J.A. in the first place. She should not now be able to use her loss of visitation rights as a justification for her failure to communicate with D.J.A. Second, P.E.'s loss of visitation rights cannot justify her failure to communicate because P.E. has not made any objectively reasonable attempts to communicate with D.J.A. *B.S.L.*, 779 P.2d at 1224. P.E. has failed to come forward with any evidence that she reasonably attempted any meaningful communication with D.J.A. In addition, at no time since the court entered its decree in October 1986 has P.E. moved for reinstatement of her visitation rights. Whether or not the custody decree denying visitation rights constituted an obstacle to communication, it cannot consti-

tute justifiable cause for P.E.'s failure to communicate.

The court's second justification for P.E.'s failure to communicate with D.J.A. is that "throughout the entire period in question P.E. suffered under a disturbed mental-emotional state." *Supra* p. 1039. In some cases, a noncustodial parent's mental-emotional condition may present justifiable cause for failing to communicate with her child. A noncustodial parent may offer evidence that her mental condition impaired her ability to communicate with her child. However, P.E. neither has offered such evidence nor even alleged that her mental condition impaired her ability to communicate with D.J.A.

Dr. J. Ortiz, M.D., and Dr. James Harper, a licensed clinical psychologist, diagnosed P.E.'s mental condition as "[b]orderline personality disorder." The criteria for this diagnosis are "[a] pervasive pattern of instability of mood, interpersonal relationships, and self image...." In P.E.'s discharge summary from the Alaska Psychiatric Institute, Dr. Ortiz wrote that P.E. had "[n]o evidence of psychosis," that "her mood was mildly distressed," and that "[h]er cognitive functioning was intact." There is no evidence linking P.E.'s borderline personality disorder to her failure to communicate. Without such evidence, I cannot conclude that the superior court clearly erred in failing to find that P.E.'s mental condition constituted a justification for failing to communicate with D.J.A. To rule otherwise on these facts would excuse a failure to communicate on grounds of any slight mental-emotional disturbance regardless of whether such condition affected her ability to communicate.

In sum, in reversing the superior court, the court ignores not only the record but also our interpretation of "justifiable cause" under AS 25.23.050 to protect the child's right to a stable, secure family relationship. P.E. failed to communicate mean-

---

4. The court found:

> [P.E.'s] severe, erratic behavior under stress has resulted in impermissible and inappropriate social behavior. She has twice defied this court by refusing to comply with its visitation order and by refusing to disclose the where-

abouts of the child, [D.J.A.], after taking him from Clare House. She has continually harassed and threatened the lives of [D.A. and] his parents. She admits but cannot explain or apparently understand the impropriety of this behavior.

ingfully with D.J.A. for fifteen months. The court claims that P.E. was justified in failing to communicate with D.J.A. because of her mental-emotional condition. However, P.E. does not allege that this condition impaired her ability to communicate with D.J.A., nor is there any evidence to support such a finding. The court also claims that P.E. was justified in failing to communicate with D.J.A. because she was denied visitation rights. However, the facts show that she was not denied communication rights and that she was not under the misconception that she was denied such rights. Moreover, even if the court's decree denying visitation rights presented P.E. with an obstacle to communication, it cannot constitute justifiable cause for P.E.'s failure to communicate because (1) the decree was imposed because of P.E.'s own conduct, and (2) P.E. never made a reasonable attempt either to communicate with D.J.A. or to reinstate her visitation rights. In light of the entire record, the superior court's finding that P.E. had no justifiable cause for failing to communicate with D.J.A. was not clearly erroneous. In fact, the record shows that the superior court was correct. Therefore, I would affirm the decision of the superior court granting L.A.'s petition for adoption.