In the Matter of the ADOPTION of K.M.M. and B.M.M., Minor Children.

No. 4321.

Supreme Court of Alaska.

May 16, 1980.

Brett M. Wood, Fairbanks, for appellant.

Thomas Fenton, Call, Haycroft & Fenton, Fairbanks, for appellees.

Before RABINOWITZ, C. J., CONNOR, BOOCHEVER and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

DIMOND, Senior Justice.

M.O. and his wife, K.M., were divorced in April, 1975. Custody of their two children, K.M.M. and B.M.M., ages six and four respectively, was awarded to their mother, K.M. In May, 1977, K.M. married G.M., and on May 23, 1978, G.M. filed a petition for the adoption of the two children.

M.O., the children's father, contested the proposed adoption on the basis that his consent was required. On September 18, 1978, the superior court granted the petition for adoption, concluding that M.O.'s consent was not required under AS 20.15.050(a). That statute provides in part:

> *Persons as to whom consent and notice not required.* (a) Consent to adoption is not required of
>
> .    .    .    .    .
>
> (2) a parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause, including but not limited to indigency,
>
> (A) to communicate meaningfully with the child, or

(B) to provide for the care and support of the child as required by law or judicial decree . . . .

The superior court found that M.O. had failed both in meaningful communication and in providing support. By statute, his consent is unnecessary if either ground is present. Thus, we must consider both M.O.'s communication with his children and his support. If M.O. failed significantly without justifiable cause in either, the superior court's decision that his consent was unnecessary to the adoption must be affirmed. For purposes of convenience, we consider the support issue first.

## SUPPORT

When M.O.'s wife, K.M., divorced him, custody of the children was given to her. M.O. was ordered by a divorce decree to pay $280.00 a month for the support of the two children. From the time of the divorce in April, 1975, until April, 1977, M.O. did not fail to meet this child support obligation. He continued his support payments during the time that his ex-wife was living with his closest friend, G.M., prior to G.M. and K.M.'s marriage in May, 1977.

In May, 1977, because of a period of unemployment, M.O. was able to send to his ex-wife only $180.00 for child support. She returned the check to M.O., apparently without explanation, because M.O. wrote to her after the check was returned stating that he did not know the reason for return of "my partial support payment." However, K.M. stated in testimony before the court on the adoption petition that she had returned the check because she and her new husband, G.M., knew what it was like to be broke, and that she had told M.O. "to keep the money and catch up later."

This return of the $180.00, coupled with M.O.'s concern that his support money was not being used properly for the support of his two children,[1] prompted him to begin placing his support money in a savings account in trust for the children.[2] It was his intention in establishing this fund for it to be so constituted that the signatures of both M.O. and his ex-wife, K.M., would be necessary before monies could be withdrawn. However, there was some misunderstanding or lack of communication between M.O. and K.M., coupled with what may have been a mistake on the part of the bank, which prevented K.M. from drawing on this account.

M.O. and his wife were divorced in the state of Washington in April, 1975. The divorce decree is not part of the record on appeal. However, there is no question that M.O. was to pay $280.00 a month for a support of his two children. For a period of two years after the divorce, M.O. sent monthly checks for $280.00 to his ex-wife, K.M. It is fair to presume from this that payment directly to her each month is what was required by the Washington divorce decree. Thus, M.O. was technically in default when in May, 1977, and thereafter, he deposited in the savings account, in trust for his children, $280.00 a month, instead of sending his money directly to his ex-wife, K.M. This situation existed for at least one year—from May, 1977, until the petition for adoption was filed on May 23, 1978.

In these circumstances, the question presented is whether M.O.'s consent to the adoption of his children by G.M. was not required by reason of his actions for a period of one year in placing the child support

1. M.O.'s concern arose from the fact that if he sent his check to a bank in care of G.M. and his ex-wife, K.M., the money would be used, not solely for the support of his two children, but as well for the two children of G.M. by former marriage. He had discovered in talking to G.M. that the monies he had been sending were being put into a fund for the four children, and not just for M.O.'s two children.

2. The record is not entirely clear as to just when the savings-trust account for the benefit

of M.O.'s children was established. M.O. testified that ever since May, 1977, he had "set aside" the money for his children so "it's there if ever called upon." Apparently, however, either in December, 1977, or January, 1978, a regular savings account in trust for M.O.'s two children was established in the National Bank of Alaska in Fairbanks, and M.O.'s first deposit into that account was the accumulation or sum of $280.00 a month from May to December, 1977.

money in a savings account in trust for the children, rather than sending monthly payments of $280.00 to his ex-wife, K.M. The superior court concluded that this arrangement did not constitute the providing of child support by M.O., because the money in the savings account was not subject to being withdrawn by K.M. The court held, therefore, that M.O.'s consent to the adoption of his children by G.M. was not required under AS 20.15.050.

We believe the facts of this case call for a different result. There is no question, from the testimony of the hearing on the adoption petition, that M.O. was deeply concerned for the welfare and best interests of his children. He had sent to his ex-wife, K.M., regular payments of $280.00 for practically two years after their divorce in April, 1975. In May, 1977, when he was out of work, he sent K.M. $180.00, which she returned to him. It was after this that M.O. set up a savings account in which he regularly and faithfully deposited $280.00 each month in trust for his two children. He made no withdrawals from this account. On September 1, 1978, the bank's records show that there was on deposit in the savings account, in trust for M.O.'s children, the sum of $4,255.00.[3] The money was there and available, if needed, even perhaps in the future, as a fund that could be utilized for the children's care and support at a later time. This is far different from a case where an ex-husband and father of the children simply ceases making any payments at all for the support of his children.

We consider it significant that after K.M. returned the May, 1977, payment of $180.00, she took no action at all to require M.O. to make the required monthly payments of $280.00. The only step she took was to write a brief note to M.O. in June, 1977, stating that the support payments could be sent to a bank in Nenana, Alaska, to be deposited in a joint account of K.M. and her husband, G.M. This letter was written following M.O.'s letter to K.M. in

which he stated that he did not understand the reason for the return of the $180.00.

K.M. was aware of the savings and trust account at least as early as September 12, 1977, when Mr. Wood, M.O.'s attorney, wrote to K.M., referring to the trust account, stating that:

[M.O.] is desirous of placing the money elsewhere so that a fund could be created which would grow as years go by. Monies could be drawn from the fund as they may be needed for the children's benefit or, if they were not needed, could be dispersed to the children when they reached majority for such purposes as a college education, etc. This seems to be [a] much more practical way of handling this than paying monies to you which aren't presently needed and which merely become co-mingled [sic] with the family funds of you and your present husband.

K.M. did not respond by demanding, for example, payment of the $280.00 a month to her under the divorce decree. Instead, her attorney, Mr. Fenton, answered Mr. Wood about five weeks later stating:

[K.M.] is not desirous of placing the money into any fund for future use. In addition to the foregoing, there is nothing to substantiate [M.O.'s] contention that [K.M.] does not need the support money for the children.

Again, no demand was made by counsel for payment of the arrearages of $280.00 a month under the divorce decree.

In the special circumstances of this case, we conclude that M.O., within the meaning of AS 20.15.050, did not fail "significantly without justifiable cause . . . to provide for the care and support" of his minor children as required by judicial decree. His constant concern was the welfare of his children. He faithfully made the required payments for their care and support—despite the fact that payments after May, 1977, were placed into a savings-trust account for the children rather than being sent to his ex-wife, K.M. Her failure to

---

3. We are aware that the bank sum is less than the amount required for the 16-month period of May, 1977, through August, 1978. We assume

the child support payment for August had not been credited to the account.

request or demand that the money be given to her for the immediate care of the children might well have caused M.O. to believe that the children were then being adequately cared for, and that the trust fund, probably to be used for the children's needs in the future, was a permissible way to discharge his obligation to provide for their support, which obligation was a continuing one until the children reach the age of majority.

■ AS 20.15.050 is modeled after a provision of the Uniform Adoption Act.[4] States which have adopted this Act have required that it be strictly construed in favor of the natural parent when the declaration of parental rights is involved.[5] Apart from the Uniform Adoption Act, it has been similarly held that the fundamental nature of parental rights requires strict construction of adoption statutes.[6] This is in keeping with our own pronouncement on the subject. In *Delgado v. Fawcett*, 515 P.2d 710 (Alaska 1973), which was decided prior to the enactment of AS 20.15.050 (the Uniform Adoption Act), we held that adoption consent provisions are designed to protect the natural rights of parents to custody, society, comfort, and services of the child. We further held that parents should not be deprived of the fundamental rights and duties inherent in the parent-child relationship except for "grave and weighty reasons." *Id.* at 712 (quoting with approval from *In re Parks Petition*, 267 Minn. 468, 127 N.W.2d 548, 553 (1964)).

Construing AS 20.15.050 strictly in favor of M.O., we hold that he did not fail substantially without justification to meet the requirements of providing for the care and support of his children, so as to prevent

G.M. from adopting the children without M.O.'s consent. The superior court was mistaken in holding to the contrary.

## MEANINGFUL COMMUNICATION

■ AS 20.15.050 also provides that consent to adoption of a child is not required if a parent for at least one year has "failed significantly without justifiable cause . . to communicate meaningfully with the child." The superior court held that M.O. had failed in this respect, and therefore that his consent to the adoption of the children by G.M. was not required.

Appellant had not wanted the divorce which was granted in April, 1975, and during that summer he attempted to effect a reconciliation. He brought his ex-wife and children to Fairbanks and they lived together the entire summer. However, the reconciliation failed, and M.O.'s ex-wife and children returned to Washington at the end of the summer.

M.O. again attempted to reconcile with his ex-wife in late 1975. He returned to Washington from Alaska and spent six weeks, from Thanksgiving to New Year's Day, with his ex-wife and children. This attempt to reconcile also failed and M.O., who then returned to Alaska, had no visits with his children from New Year's Day, 1976, until June of that year. However, he did maintain close contact by letter and telephone.

M.O.'s father brought M.O.'s son to Alaska to visit him in June, 1976. The child spent the summer (two and one-half months) with M.O. M.O.'s daughter did not make the trip because she apparently grew

---

4. Uniform Adoption Code § 6, 9 U.L.A. 26 (amended 1971) provides in part:

(a) Consent to adoption is not required of:
(1) a parent who has [deserted a child without affording means of identification, or who has] abandoned a child;
(2) a parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree.

5. *Adoption of Biery*, 164 Mont. 353, 522 P.2d 1377, 1380 (1974); *Huey v. Lente*, 85 N.M. 585, 514 P.2d 1081, 1091–92 *rev'd on other grounds*, 85 N.M. 597, 514 P.2d 1093 (1973); *Adoption of Schoeppner*, 46 Ohio St.2d 21, 345 N.E.2d 608, 610 (1976); *Mann v. Garrette*, 556 P.2d 1003, 1004 (Okla.1976); *see Kottsick v. Carlson*, 241 N.W.2d 842 (N.D.1976).

6. *T.C.H. v. J.M.S.*, 190 Colo. 246, 545 P.2d 1357, 1359 (1976); *Adoption of Sharp*, 197 Kan. 502, 419 P.2d 812, 814 (1966).

to dislike Alaska during her visit in the summer of 1975.

In circumstances not clear from the record, G.M., M.O.'s best friend, began "communicating" with M.O.'s former wife some time prior to September, 1976. This upset M.O. greatly. In circumstances again not clear from the record, M.O.'s ex-wife and G.M. began to live together with M.O.'s children in Anderson, Alaska, approximately a 90-minute drive from Fairbanks.

M.O.'s communications with his ex-wife became less frequent, apparently because of his hurt and confusion over the situation of his best friend living with his ex-wife.

However, on Easter (April) 1977, M.O. personally brought Easter baskets, cards, and letters to his children at the home of G.M. and K.M. The following week his children spend the weekend with him in Fairbanks. Even though M.O. did not visit with his children in the year beginning May, 1977, and ending May, 1978, he did communicate regularly with the children at Christmas and birthdays during that period of time by sending presents, cards, and letters.

It is evident from what we have related that M.O.'s failure to visit his children after his former wife married G.M. was due to the fact that it was an emotionally traumatic episode for him to see the woman he loved living in a marital state with a man who had been M.O.'s closest friend. This is certainly understandable. If one has any degree of emotional sensitivity at all, he would consider he had betrayed by one who had been close to him in friendship. He obviously would find it embarrassing and uncomfortable, if not unbearable, to be in the presence of his former wife and a person, who had been his best friend, living together as wife and husband. And the difficulty of seeing this would be compounded if the children, whom he loved, appeared to relate to such a "friend" as their father, rather than to M.O., the man who was their real father.

In these circumstances, we cannot hold that M.O. had in fact forsaken his children in favor of their being adopted by G.M. All of M.O.'s activities point the other way. As we stated, he communicated directly with his children at Christmas and on birthdays by sending presents, cards, and letters. He was unable to call his children by telephone because K.M. and G.M. lived in Anderson, a 90-minute drive from Fairbanks, and they had no telephone. M.O. had to go to Kotzebue to work in February, 1978, and he had planned when he returned in June, 1978, to have the children in his custody for a period of six weeks. But he was foreclosed from carrying out these plans by reason of the petition for adoption being served upon him upon his return to Fairbanks, and by his ex-wife refusing to allow him to visit with the children after the adoption petition was filed.

Applying the rule of law we have mentioned in our discussion of whether M.O. had provided for the care and support of his children, we construe the adoption-consent provisions of AS 20.15.050 strictly in favor of a natural parent and against a finding that such parent had failed significantly without justifiable cause, to communicate meaningfully with his children for a one-year period. In circumstances we have mentioned, we hold that M.O.'s communications with his children during the year May, 1977, to May, 1978, had meaning and were significant. The superior court was mistaken in holding the opposite.

The decree of adoption of the superior court is REVERSED.

MATTHEWS, Justice, dissenting.

I would affirm.

From mid-April of 1977 until the petition for adoption was filed on May 23, 1978, M.O.'s only communication with his children was by means of birthday and Christmas presents accompanied by cards with brief notes. I do not believe that this is meaningful communication as contemplated by AS 20.15.050(a)(2)(A).[1] In distinguishing

1. For the two-year period ending in the filing of the petition, M.O. had visited his children only

twice. I agree with the trial court's observation that:

between meaningful and non-meaningful communications it is evident that the legislature intended that the mere symbolic observation of birthdays and holidays would not be enough to maintain the rights of parenthood.

Moreover, I do not believe that there was justifiable cause for M.O.'s failure to communicate with his children. For all but four of the thirteen months preceding the petition for adoption M.O. lived only a one and one-half hour drive from his children. There is no claim that he was prevented by their mother and step-father from visiting them. During this period M.O.'s children became nine and seven years of age and thus were old enough to appreciate visitations by their father, had they been forthcoming. Although M.O. was evidently hurt

because his former wife had married his friend, his duty to his children required him to overcome his personal sensibilities. The trial court concluded, correctly in my view, that "embarrassment or hurt feelings because the natural father's former wife married the natural father's friend two years after the divorce does not constitute just cause for the failure to . . . meaningfully communicate with the minor children."

no meaningful parent-child relationship can be maintained when the natural father visits with the minor children a total of two occasions in two years; the father becomes no longer a father but just some person the children knew in the past.