718 P.2d 948 (1986)
In the Matter of J.J.J., A Minor.
No. S-718.
Supreme Court of Alaska.
May 9, 1986.
Rehearing Granted in Part and Opinion Amended June 26, 1986.
*949 William T. Ford, Anchorage, for appellant.
Jeri E. Byers, Lee Holen, Boyko, Davis & Dennis, Anchorage, for appellee.
John Reese, Reese, Rice and Volland, Anchorage, Guardian Ad Litem.
Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

OPINION
MOORE, Justice.
This is an expedited appeal from an adoption decree whereby a 7-year-old boy was adopted by his stepfather over the objections of the boy's biological father. Because of the biological father's history of nonsupport, his consent was deemed unnecessary.
The primary issue in this case is whether the master erred in finding that for at least a 12-month period, the biological father failed significantly without justifiable cause to provide support required by judicial decree.[1] This finding was sustained by the superior court. A second issue is whether the superior court erred in reversing the master's determination that it was not in the best interests of the child for the adoption to be granted. Lastly, at issue is whether the superior court erred in ruling that the biological father could, upon a *950 proper showing be granted enforceable post-adoption visitation rights.
We conclude that the superior court correctly affirmed the master's finding with respect to support and correctly reversed her best interests determination. However, the superior court erred in allowing for post-adoption visitation rights.[2]

I. BACKGROUND SUMMARY
On May 25, 1982 the boy's biological parents were divorced. B.J., the biological mother, was awarded custody of the boy and J.B., the biological father, was ordered to pay $200 per month as child support. J.B. made no payments until August 1982, when he made a single $200 payment after being contacted by the Child Support Enforcement Agency (C.S.E.A.).
Thereafter, from September 1982 through March 1983, J.B. made no payments toward the support of the boy. In April and May of 1983 the C.S.E.A. garnished a total of $1,000 of J.B.'s wages to apply toward his child support arrearages. Thereafter, from May through October 1983, J.B. continued to pay nothing toward the boy's support.[3]
In August 1983 the boy's mother and his stepfather, S.J., decided that S.J. should seek to adopt the boy and so advised J.B.. In November 1983, shortly before the filing of the adoption petition, J.B. and his new wife paid $1,800 against part of his child support arrearages, after again being contacted by the C.S.E.A.
From December 1981 until the filing of the adoption petition, on December 19, 1983, J.B. had almost no contact with the boy.[4] Twice during the last six months of this period J.B. reportedly informed the boy's mother, B.J., that he now wanted to visit the boy. However, B.J. resisted J.B.'s request for unsupervised visitation with the boy, stating that she believed that J.B. should slowly develop a relationship with the boy after having had no contact with him for such a long period. It does appear that, beginning well before the divorce, J.B. virtually ignored the boy.[5]
During the period since his marriage to B.J., the boy's stepfather evidently established a close parental relationship with the boy.
In December 1983 the boy's stepfather, S.J., filed the petition to adopt him. The biological father, J.B., refused to consent to the adoption. The stepfather contended that J.B.'s consent was unnecessary pursuant to AS 25.23.050(a)(2)(B), because J.B. had "failed significantly, without justifiable cause ... to provide for the care and support of the child as required by law or judicial decree."
The probate master found that J.B. had, for at least a year, significantly and unjustifiably failed to provide court-ordered support and had lost his right to withhold consent to the adoption. However, the master also found that the adoption decree would not be in the boy's best interests because he was curious about his biological father and seemed interested in knowing him (notwithstanding the boy's attachment to his stepfather). By law an adoption decree would terminate J.B.'s parental rights regarding the boy.
*951 The superior court sustained the master's finding on consent, but overturned the "best interest" finding as clearly erroneous. The court also concluded that the adoption should be granted and that "upon a proper showing, the biological father can be afforded visitation rights." This expedited appeal followed.[6]

II. DISCUSSION

A. STEPPARENT ADOPTION IN ALASKA
As commentators have noted,[7] the very problem now before us is an increasingly common occurrence, given the increase in divorce and remarriage in our society. Nevertheless, despite voluntarily assumed obligations and the existence of a strong bond between stepparent and stepchild, such a relationship lacks legal protection in the event of the desertion or death of the stepparent's spouse (the custodial "natural" parent).[8] In such an event the noncustodial "natural" parent, even a parent who has rarely paid child support or merely made an occassional gesture of communication, may automatically assert primary rights to take legal custody of the child, despite the child's need for a stable and continuous family relationship. Stepparent adoption assures that the child may remain with his existing family. However, adoption has seemed a harsh remedy when the biological parent refuses consent. In Alaska, as in most states, an adoption decree has the effect of terminating an adopted child's legal relationship with all of his blood relatives.[9]
Well-known commentators have proposed "incomplete adoption" as a middle approach that would better accommodate the interests of both the stepparent and the noncustodial natural parent by giving equal custody rights to each.[10] However, the Alaska legislature apparently has not yet considered this modern approach that would allow the courts a more reasonable choice in deciding stepfamily cases. Unfortunately, the present law's all-or-nothing approach is unrealistic and often compels an unfair result for a child, for a stepfamily, or for a noncustodial "natural" parent. See also Note, Stepparent Custody: An Alternative to Stepparent Adoption, 12 U.C.D.L.Rev. 604 (1979), which we noted in D.L.J. v. W.D.R., 635 P.2d 834, 838 n. 5 (Alaska 1981).[11] We are therefore left with *952 the harsh choices inherent in deciding between adoption or no adoption at all.
Alaska has adopted a modified version of the Uniform Adoption Act.[12] The Uniform Adoption Act sets forth the circumstances under which an adoption should be granted without a natural parent's consent, including a provision indicating that the court must consider the best interests of the child in determining whether to grant an adoption.[13] Alaska's version of the Act focuses on a noncustodial parent's failure to meaningfully communicate with a child, significant failure to pay child support, and other acts of abandonment.
In this court's prior decisions in this area[14] we have declined to dispense with a noncustodial parent's right to withhold consent to a stepparent adoption as long as the noncustodial parent had made a few perfunctory communications or an occasional gesture of support. In Matter of Adoption of K.M.M., 611 P.2d 84 (Alaska 1980), we found that the biological father's unwillingness to visit his children for over one year was justified by "the mere fact that it was emotionally traumatic for the natural father to see his children and former wife living with a man who had been the father's closest friend." R.N.T. v. J.R.G., 666 P.2d 1036, 1039 (Alaska 1983), discussing Matter of Adoption of K.M.M.. In R.N.T. v. J.R.G. this court reversed a superior court's decision to allow a stepfather to adopt the children of R.N.T. because R.N.T. had not maintained meaningful communication with his young children during the 14-month period that he was in prison. We emphasized that parental conduct that causes the loss of a parent's right to consent must be willful, noting that the commentary to the Uniform Adoption Act makes it clear that the willfulness requirement was intended to be continued in the Uniform Adoption Act. That commentary indicated that parental communication and support is required "when the parent is able to do so."[15] This court then concluded that since the circumstances of R.N.T.'s incarceration and parole clearly prohibited him from communicating with his children, such circumstances justified his noncommunication. 666 P.2d at 1039. Upon reflection, *953 however, we now find that the R.N.T. dissent actually presented the better approach:
R.N.T. states that the terms of his imprisonment and parole effectively prevented him from having contact with his children. This should not be the end of the analysis, as it is for this court, but only the beginning. Not all parents who are incarcerated or on parole are precluded from communicating with their children; it simply is not an automatic condition of imprisonment or parole. The issue that must be addressed is whether the constraints imposed on R.N.T. were the result of his own conduct, in which case his failure to communicate would not be justifiable, or were instead the result of circumstances over which he had no control.
.....
The record before this court indicates that the constraints imposed upon R.N.T. were the result of his own conduct.
.....
It is true ... that the adoption statutes must be strictly construed in favor of the natural parent. We did not, however, judicially abrogate the provision by which the consent of a parent is not required if the parent has failed significantly without justifiable cause to communicate meaningfully with the children. This court concludes that anytime a parent is precluded from communicating with his or her children, whether or not the constraints are a result of the parent's own conduct, "the failure to communicate is properly considered non-wilful and thus justifiable cause." ... Such a result can frequently reward the guilty and punish the innocent. This is certainly not mandated by Alaska's statutes.
R.N.T. v. J.R.G., 666 P.2d at 1041-42 (Compton, J., dissenting).
We take this opportunity to clarify that, in order for a noncustodial parent to block a stepparent adoption, he or she must have maintained meaningful contact with a child, and must have provided regular payments of child support, unless prevented from doing so by circumstances beyond the noncustodial parent's control. Circumstances resulting from the noncustodial parent's own conduct cannot excuse such a parent's significant failure to provide support or maintain meaningful communication. Moreover, failure to support or to maintain contact with a child should not be excused by the emotional antagonism or awkwardness that may exist between former spouses. As the dissent stated in Adoption of K.M.M.: "In distinguishing between meaningful and non-meaningful communications it is evident that the legislature intended that the mere symbolic observation of birthdays and holidays would not be enough to maintain the rights of parenthood." K.M.M., 611 P.2d at 89 (Matthews, J., dissenting). Speaking of the noncustodial parent in K.M.M., Justice Matthews observed that "his duty to his children required him to overcome his personal sensibilities." Id. This observation applies as well to J.B.'s prolonged noninvolvement with his son, which cannot be justified by J.B.'s and B.J.'s personality differences.[16]

B. J.B.'s SIGNIFICANT FAILURE TO SUPPORT
AS 25.23.050(a) specifies: "Persons as to whom consent and notice not required" in adoption cases. This provision provides that consent is not required of
(1) ... a parent who has abandoned a child for not less than six months;
(2) a parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause, including but not limited to indigency,
(A) to communicate meaningfully with the child, or

*954 (B) to provide for the care and support of the child as required by law or judicial decree... .
J.B. contends that the "period of at least one year" of significant nonsupport must immediately precede the adoption petition. We disagree, as do other courts.[17] J.B. also suggests that his occasional payment should suffice to preserve his right to withhold consent to any adoption of J.J.J.
The statute does not say that the period of "at least one year" must immediately precede the filing of an adoption petition.[18] One year is the minimum period which may be considered. Thus the superior court correctly considered the entire 17-month period during which J.B. made only one voluntary payment of $200 on his court-ordered obligation to contribute to J.J.J.'s support.
Sporadic partial payments do not preclude a finding of significant failure to provide child support. See Henson v. Money, 1 Ark. App. 97, 613 S.W.2d 123, 124 (1981). Child support payments should be substantial or "regular" and constitute a "material factor" in the support of a child. See Adoption of CCT and CDT, 640 P.2d 73, 75-76 (Wyo. 1982); Adoption of Leistikow, 37 Or. App. 539, 588 P.2d 53, 56 (1978). Other courts also look askance at delinquent noncustodial parents who make only occasional gestures of support or make irregular payments that "appear to have been attributable to some form of compulsion" or the impending initiation of adoption proceedings. See Pender v. McKee, 582 S.W.2d at 935-36.[19]See also Mortenson v. Tangedahl, 317 N.W.2d 107, 113-14 (N.D. 1982).
The dissent insists that "no rule of law or principle of logic" requires that child support must be "uncompelled". However, the purpose of the waiver-of-consent statute was to provide an objective measure (at least one year) of when a parent has, in the practical sense, forsaken a child. It would make no sense at all to infer parental concern from payments that a government agency has to garnish from the income of a parent who has refused to provide support. Nevertheless, the dissent suggests that payments garnished from a recalcitrant parent's income should signify the same parental concern that voluntary support payments signify, because all court-ordered child support is "compelled" and "there is no certainty what the terms `compulsion' or `voluntary' mean" in this context. Actually, at common law all parents have a duty (not a "voluntary" option) to support their children. Court orders for child support set forth the amount of the parent's obligation. Most parents choose to abide by what the courts determine to be the child's financial needs. Garnishment occurs only as a last resort, when a parent has refused to meet this important obligation. Common sense tells us that a person who chooses to meet his obligations shows more responsibility than a person who forces the C.S.E.A. to garnish his income or attach his assets. The existence of an obligation does not mean that an individual's *955 choices have no significance. We decline to dwell any further on this aspect of the "free will" debate.
As for J.B.'s 11th-hour (or 19th-month) payment to partially pay off his arrearages a few weeks before the adoption petition was filed, it would be absurd to believe that the legislature meant for a last-minute balloon payment to cancel out the import of a substantial period of nonsupport and noninvolvement. Other courts have expressed similar views:
After the required period of one year has passed, resumption of payment of support for a brief period, particularly after the commencement of the adoption proceeding or just prior thereto, is not sufficient to bar an adoption without the consent of the delinquent father by starting a new one year period of non-support under the statute.
Pender v. McKee, 582 S.W.2d at 935 (emphasis added).
[I]f it were possible to pay upon an arrearage in the twelfth month of each year and thereby defeat each effort of the adoptive step-parent to adopt children he is attempting to be a father to, the intent of the legislature ... would surely be defeated.
In re Daigle, 232 So.2d 548, 554 (La. App. 1970).[20]
We hold that courts shall consider a parent's entire history of support or non-support to determine whether that parent has waived his or her right to block a child's adoption by a stepparent.[21]
J.B. also contends that his significant failure to support should be excused because he allegedly had an agreement with the boy's mother that he would not have to make support payments as long as she received public assistance for the care of the boy. As the master found, this claim is meritless.
J.B. also argues that his significant failure to support the boy was the excusable result of his ex-wife's resistance to his belated interest in having the boy visit him, in August 1983, after more than a year of no communication at all with him.[22] This, however, is no justification at all. Many decisions have held, and we agree, that a parent's duty to provide child support is not excused by the conduct of others unless that conduct actually prevents performance of the child-support obligation.[23]See, e.g., Pender v. McKee, 582 S.W.2d at 935-36; Adoption of Infants Reynard, 252 Ind. 632, 251 N.E.2d 413, 417 (1969).

*956 C. THE CHILD'S BEST INTERESTS
The probate master found that although J.B.'s consent to the boy's adoption was unnecessary because of his significant failure to provide support, the adoption should nonetheless be denied because the boy might benefit from renewed contact with J.B. We conclude that the superior court correctly overruled the probate master on this issue. The master's finding that the boy's adoption would not be in his best interest was clearly erroneous.
In AS 25.24.150(c) the legislature has set forth statutory standards to guide the trial courts in the difficult determination of a child's best interests in custody disputes. The statute directs the courts to consider:
(1) the physical, emotional, mental, religious, and social needs of the child;
(2) the capability and desire of each parent to meet these needs;
(3) the child's preference if the child is of sufficient age and capacity to form a preference;
(4) the love and affection existing between the child and each parent;
(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
(6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent.
Although the probate master correctly considered the boy's curiosity about his long-absent biological father, this single factor is far outweighed by other significant factors and thus does not justify the master's finding that the adoption would not be in the boy's best interests. We have repeatedly stated that in analyzing the best interests of a child, no single factor should be allowed to outweigh all others. S.O. v. W.S., 643 P.2d 997, 1006 (Alaska 1982); Johnson v. Johnson, 564 P.2d 71 (Alaska 1977), cert. denied, 434 U.S. 1048, 98 S.Ct. 896, 54 L.Ed.2d 800 (1978); King v. King, 477 P.2d 356 (Alaska 1970); Sheridan v. Sheridan, 466 P.2d 821 (Alaska 1970). Most of the factors listed above greatly favor the strong relationship between the boy and his stepfather. The evidence demonstrated that J.B. was a virtual stranger to the boy. In contrast to J.B.'s extended period of noninvolvement with the boy, the record shows that the stepfather has been an exceptionally involved and devoted parent.
This court has previously stated that in such cases as this the test is whether there is "conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship." In re D.M. v. State, 515 P.2d 1234, 1237 (Alaska 1973) (footnote omitted). As we later explained in Adoption of A.J.N., 525 P.2d 520, 523 (Alaska 1974):
The test focuses on two questions  has the parent's conduct evidenced a disregard for his parental obligations, and has that disregard led to the destruction of the parent-child relationship? ... This part of the test can only be satisfied by proof that the parent's conduct evidences a conscious disregard of his obligations.
In A.J.N. this court decided that the noncustodial natural parent's conduct did not evidence a disregard of his parental obligations to his daughter. R.N., the noncustodial parent, unlike J.B., had consistently tried to exercise his visitation rights. He had sought the aid of the courts, with the result that his ex-wife was held in contempt for keeping R.N. from visiting their daughter. We also noted that R.N. had established a trust account for his daughter's benefit. We concluded that R.N.'s "inability to establish a close relationship with his daughter [was] not of his doing or choice, but in spite of his wishes." A.J.N., 525 P.2d at 523. In the case before us, we cannot conclude that J.B.'s significant nonsupport, or his prolonged failure to have meaningful contact with his son, was "not of his doing or choice." Even though we have liberally construed the controlling *957 statute in the noncustodial parent's favor,[24] we are not compelled to render it so meaningless that courts can never dispense with a noncustodial parent's consent to an adoption.
The superior court's findings in an adoption case are subject to the "clearly erroneous" standard generally used for review of questions of fact. D.L.J., 635 P.2d at 838. We have previously stated that the trier of fact properly could evaluate a noncustodial parent's verbal expressions of intent. Adoption of V.M.C., 528 P.2d 788, 794 (Alaska 1974). We have taken a similar stance regarding whether a noncustodial parent has had sufficient cause for significantly failing to support or meaningfully communicate with a child. D.L.J., 635 P.2d at 839. However, we again emphasize that it is up to the superior court to determine what grounds are objectively acceptable as a justification. Id.
The superior court properly determined that J.B. had not sufficiently countered the clear and convincing evidence of his significant nonsupport. The superior court was not clearly erroneous in determining that J.B.'s explanations were not objectively acceptable justifications.
THEREFORE, except for the superior court's order as to the possibility of granting post-adoption visitation to J.B., the superior court's decree of adoption is AFFIRMED.
MATTHEWS, Justice, joined by RABINOWITZ, Chief Justice, dissenting.

I.
This case involves the meaning of our forfeiture of consent statute, AS 25.23.050(a)(2), which provides:
(a) Consent to adoption is not required of
... .
(2) a parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause, including but not limited to indigency,
(A) to communicate meaningfully with the child, or
(B) to provide for the care and support of the child as required by law or judicial decree; ... .
The issue presented is whether the superior court erred in concluding that subpart (B) of this statute applied, thus making unnecessary the consent of the father.[1]
The facts are as follows. The dissolution decree required the payment of $200 in child support for each month beginning June 1, 1982. Nineteen installments of $200 each, a total of $3,800, should have been paid between the date of the decree *958 and the date of the petition for adoption, December 19, 1983. According to the records of the Child Support Enforcement Agency, the father paid $200 on September 8, 1982; an order to withhold and deliver $1,000 of the father's wages under AS 47.23.250 netted $971.53 on April 27, 1983 and $28.47 on May 11, 1983; a payment of $1,800 was made on November 15, 1983; and a payment of $250 was made on November 29, 1983. Thus, the father had paid $3,250 of the total support due of $3,800 and was less than three months behind in child support when the petition for adoption was filed.
Two questions of statutory interpretation concerning the meaning of AS 25.23.050(a)(2)(B) are presented. They are:
(1) Does the period of at least one year referred to in the statute mean any period of one year or that period which immediately precedes the filing of the petition for adoption?
(2) Should the amounts obtained by the Child Support Enforcement Agency from the father's employer be taken into account as part of the provision of support by the father?
Only if one concludes that the statute refers to any year rather than the year which precedes the filing of the petition for adoption and that the withheld wages cannot be counted as the provision of support, can the conclusion be drawn that the father in this case has waived his right to withhold consent to the adoption of his son.

A. The One Year Period
I would construe AS 25.23.050(a)(2) to refer to the year immediately preceding the filing of the petition for adoption. This interpretation is reasonable, in accordance with the decisions of courts in other jurisdictions construing similar statutes, and required under the rule of construction favoring the rights of the parent which we have adopted concerning this statute. Further, interpreting the statute to refer to the year immediately preceding the filing of the petition for adoption avoids the harsh and unjust results which are distinctly possible under the majority's interpretation of the statute.
In First National Bank of Fairbanks v. Taylor, 488 P.2d 1026, 1032 (Alaska 1971), we were faced with a problem of interpretation like that which is presented here. At issue was Civil Rule 41(e) which provided that cases "which have been pending in a court for more than one year without any proceedings having been taken therein" may be dismissed "at any time on motion of any party... ." The plaintiff had let more than a year lapse between answering interrogatories and moving for a pre-trial conference. Subsequently, defendant moved to dismiss and his motion was granted. Id. at 1027-28. On appeal defendant sought to justify the dismissal on the basis that it was authorized under Rule 41(e) because of the one year lapse. We rejected this argument, holding that the one year period referred to in the rule was the period immediately preceding the motion to dismiss. Id. at 1031-32. First National Bank thus demonstrates that it is reasonable to construe language which refers to a period of delinquency without specifying when it takes place to mean a current period of delinquency rather than one which has been ended by intervening affirmative action.
Statutes similar to our forfeiture of consent statute have been construed by courts in several jurisdictions. As noted in the majority opinion, some courts have concluded that the one year period, or its analog, should be read to mean any such period rather than the period which comes just before the petition for adoption.[2] Maj. Op. at 954, n. 17. However, other courts have *959 concluded that the period intended is that which immediately precedes the petition for adoption. E.g., Sale v. Leachman, 218 Ga. 834, 131 S.E.2d 185 (1963); In re Adoption of Sharp, 197 Kan. 502, 419 P.2d 812, 814-15 (1966); Petition of R.H.N., 673 P.2d 805, 806 (Colo. App. 1983), appeal after remand, 678 P.2d 1070 (1984), aff'd 710 P.2d 482 (1985). This result has been reached because it is reasonable,[3] and because termination of one's parental rights is a drastic action[4] requiring that statutes like the present one be narrowly construed.[5]
Like the authorities which have construed similar statutes to refer to the period immediately preceding the petition for adoption, we have adopted a strict rule of construction in favor of parental rights with reference to AS 25.23.050(a)(2)(B). We stated in D.L.J. v. W.D.R., 635 P.2d 834, 837 (Alaska 1981):
In interpreting AS 20.15.050(a)(2), we have required that it be strictly construed in favor of a natural parent. In re Adoption of K.M.M., 611 P.2d 84, 87 (Alaska 1980). We have consistently held that
adoption consent provisions are designed to protect the natural rights of parents to custody, society, comfort, and services of the child.... [P]arents should not be deprived of the fundamental rights and duties inherent in the parent-child relationship except for "grave and weighty reasons."
This policy of strict construction means that where two interpretations of the statute are reasonably possible, that interpretation which is most protective of the rights of the natural parent is to be selected. Since interpreting this statute to refer to the one year period immediately preceding the petition is reasonable, and since that interpretation is more protective of the rights of the natural parent than construing the statute to refer to any one year period, the former interpretation should be adopted.
*960 Further, construing the one year period to be that which immediately comes before the filing of the petition for adoption seems more reasonable than the rule which permits forfeiture of the right to withhold consent for any year of dereliction. Under a strict "any year" interpretation, if a parent did not support his children for one year long before the filing of a petition for adoption, but since that year had been faithful in supporting them and had made up all arrearages, his consent would nonetheless not be required under the statute. Such a result would be extremely unjust in many cases. This harshness may be tempered to some extent by the majority's declaration that "courts shall consider a parent's entire history of support" in determining waiver. Majority Op. at 955 (emphasis in original). The trouble with this is that it cuts us completely adrift from the statute. The purpose of the statute was to provide a relatively simple means by which waiver could be determined,[6] in contrast to the often difficult questions of intent which are encountered when the question is whether a child has been abandoned. See Commissioners Note, Uniform Adoption Act § 6, 9 U.L.A. 27 (1979). This purpose will be frustrated under the court's "entire history" test.[7]

B. Provision of Support
The majority concludes that only payments which are made without compulsion should count as provision of support by the parent. There are several reasons why this construction should not be adopted.
First, the requirement of non-compulsion is not expressed in the statute, nor may it reasonably be implied. We have construed the statute to require that non-compliance be willful, R.N.T. v. J.R.G., 666 P.2d 1036, 1038 (Alaska 1983), but no rule of law or principle of logic requires that compliance be uncompelled. All that the statute calls for is support. It is neutral on the question of the providing parent's state of mind when this is accomplished. "Whatever his motive, the not insignificant payment operate[s] to bar application of the statute." Haynes v. Mangham, 375 So.2d 103, 106 (La. 1979).
Second, the rule of construction that the statute be interpreted in the manner most protective of the rights of parents indicates that a requirement of non-compulsion should not be read into the statute.
Third, there is no certainty what the terms "compulsion" or "voluntary" mean in the context of court ordered child support. All payments of support under such an order are compelled. Indeed, one of the cases relied on by the majority suggests that no payment made under an order of support can be considered voluntary. Mortenson v. Tangedahl, 317 N.W.2d 107, 114 (N.D. 1982) quoting with approval Lambertus v. Santino, 608 S.W.2d 502, 506 (Mo. App. 1981).
The majority tells us that "the purpose of the waiver of consent statute was to *961 provide an objective measure of when a parent has, in the practical sense, forsaken a child." Majority Op. at 954 (emphasis in original). I agree. It does not follow, however, that coerced payments necessarily indicate abandonment or lack of parental concern. An aggressive former spouse can garnish wages after only a slight delay in payment, and a non-custodial parent may be passively content to provide support in that way. That might be seen as a character flaw on the part of the non-custodial parent, but following a divorce people do not always behave with perfect rationality. So long as the non-custodial parent visits with his children it can not be said that, in a practical sense, he has forsaken them.

II.
Because I would hold that the father did not forfeit his right to withhold consent to the adoption of his son, I would not reach the question of whether the adoption was in the best interest of the son. D.L.J. v. W.D.R., 635 P.2d 834, 838 (Alaska 1981). I thus express no view as to whether the best interest determination made by the trial court is clearly erroneous.
I will, however, observe that the majority opinion's discussion of this issue is unbalanced. It does not mention the fact that the mother in this case for nearly a year prevented communication between the father and his son and the fact that the father in this case, like the father in Adoption of A.J.N., 525 P.2d 520 (Alaska 1974), sought the aid of the courts in an effort to enforce his visitation rights. I quote from the decision of the Master which was adopted by the superior court:
The undersigned believes that J.B. did attempt to re-establish contact with his son commencing in January 1983 but that his attempts thereafter in February, April, and July were resisted by B.J. [the mother] a situation which forced J.B. to take legal action to enforce his visitation rights in September of that year.

III.
The majority opinion contains statements which do not bear on the approach I would use in deciding this case, but with which I disagree. I will note them here.
A. At footnote 19 the majority opinion states:
Even if we pretend that the garnished $1,000 was voluntary support, the fact would remain that during the period from May 1982 through October 1983 J.B. owed $3,600 for the boy's support, but he significantly failed to pay $2,400 of that amount. During this prolonged period of well over one year, J.B.'s unjustified failure to provide two-thirds of the necessary support cannot be considered insignificant. The controlling statute, AS 25.23.050 clearly states that a parent loses the right to withhold consent to adoption if there has been a 12-month period of significant and unjustified nonsupport, as in J.B.'s case.
(Emphasis in original).
Setting aside as a mere quibble the fact that the obligation of support under the decree did not begin until June of 1982, the substance of this statement is that payment of $1,200 when $3,600 is owed is not the significant provision of support. This is in conflict with the view taken by the courts of other jurisdictions concerning similar statutes. Some jurisdictions hold that payment of even one installment over the relevant period is enough to avoid forfeiture.[8] Others require more. For example, in Louisiana it is thought that payment of between 20% and 30% of the amount owed will suffice to avoid forfeiture.[9] However, in no jurisdiction that I have found would payment of one-third of the amount due fail to constitute significant *962 support. Thus the substance of the majority's statement in footnote 19 is unique in its harshness.
B. On pages 952 through 953 the majority opinion disapproves of four of our decisions, R.N.T. v. J.R.G., 666 P.2d 1036 (Alaska 1983); D.L.J. v. W.D.R., 635 P.2d 834 (Alaska 1981); Matter of Adoption of K.M.M., 611 P.2d 84 (Alaska 1980); and Matter of Adoption of A.J.N., 525 P.2d 520 (Alaska 1974). In my view this discussion is in large part wrong and completely unnecessary.
In reference to these four cases, the majority says they stand for the proposition that so long as the noncustodial parent has "made a few perfunctory communications or an occasional gesture of support" his consent will not be dispensed with. Majority Op. at 952. This is demonstrably wrong because in three of the cases the issue was not whether the parent had complied with the statutory requirements, but whether his non-compliance was excused. Only in K.M.M. was the question one of compliance.
The support question in K.M.M. was whether regular payments to a trust established for the children was a permissible method of discharging the parent's support obligation. K.M.M., 611 P.2d at 85-86. There was no question of "an occasional gesture of support." There was a legitimate question in K.M.M. as to whether the father's communications were meaningful or, as today's majority would have it, perfunctory. The resolution of that factual question has no bearing on this case because the issue here is not the sufficiency of communication, but support.
The majority takes special pains to disapprove of R.N.T. Majority Op. at 952-953. In that case one issue was whether imprisonment of the father which resulted in his inability to maintain meaningful communication with his children was a justifiable cause for failing to communicate. R.N.T., 666 P.2d at 1038-39. We noted that not all imprisonment would preclude a parent from communicating with his children, but where it did it would be justifiable cause under the statute. We further concluded that as a factual matter the circumstances of the father's incarceration and parole had prevented him from communicating with his children. Id. at 1039. Justice Compton dissented on the basis that it was not the imprisonment and parole as such which had precluded the father from communicating, but special restraints which had properly been imposed because of his abusive conduct. Id. at 1041. Thus, the difference between the majority in R.N.T. and the dissenting opinion of Justice Compton was based on the weight to be given to certain facts unique to that case. There are no similar facts in the present case. Further, the issue here is as to the sufficiency of support rather than whether lack of communication was justified. For the present majority to adopt the dissenting opinion in R.N.T. is thus wholly gratuitous.
NOTES
[1] Under the controlling statute, AS 25.23.050, a noncustodial parent loses the right to withhold consent after a 12-month period of significant and unjustifiable nonsupport or noncommunication with his or her child. Such nonsupport need not be absolute, communication must be meaningful, and an asserted justification must be objectively acceptable.
[2] This precise issue was recently decided in In the Matter of W.E.G. and J.R.G., 710 P.2d 410 (Alaska 1986). We held that AS 25.23.130 precludes granting post-adoption visitation to biological relatives of an adopted child.
[3] J.B.'s earnings in 1982 appear to have been $22,518; his earnings during three quarters of 1983 appear to have been $18,750.
[4] During the period of separation preceding their divorce, and during the period after their divorce, B.J. repeatedly tried in vain to persuade J.B. to visit the boy. J.B. often drove past the boy's residence on his way to and from work and yet declined to stop to visit, even when the boy chased or cried after J.B.'s car.
[5] During this period, in the guardian ad litem's words, J.B. not only provided almost no support, but essentially "ignored" the young boy. Although J.B. knew where his ex-wife and the boy resided, J.B. did not call or write to the boy for more than a 12-month period. J.B. also acknowledged at trial that he was never kept from seeing the boy.
[6] This "expedited" appeal was filed in November 1984 and oral argument was heard in June 1985.
[7] See, e.g., B. Bodenheimer, New Trends And Requirements In Adoption Law And Proposals For Legislative Change, 49 S.Cal.L.Rev. 10 (1975); Comment, A Survey Of State Law Authorizing Stepparent Adoptions Without The Non-Custodial Parent's Consent, 15 Akron L.Rev. 567 (1982); Comment, Stepparent Custody: An Alternative To Stepparent Adoption, 12 U.C.D.L. Rev. 604 (1979).
[8] In the case before us, both the guardian ad litem and J.B. indicate that the boy's mother has very serious health problems. Indeed, J.B.'s appellate brief refers with some degree of insensitivity to the time "after [she] is out of the picture."
[9] AS 25.23.130(a). Thus the biological parent no longer has visitation rights, support obligations, or statutory property rights under the laws of descent and distribution. However, in a stepparent adoption there is no termination of the child's legal relationship with the biological parent married to the stepparent.
[10] See, e.g., B. Bodenheimer, New Trends And Requirements In Adoption Law And Proposals For Legislative Change, 49 S.Cal.L.Rev. 10, 44-46 (1975). The biological parent's support duties would be reduced or terminated; the stepparent's rights would be expanded by allowing the child to assume the stepparent's surname and to remain within his stable family situation even in the event of the death or desertion of a custodial natural parent. This middle approach, formal stepparent custody, stops short of adoption and allows the noncustodial natural parent to retain visitation rights.
[11] Various courts and commentators have pointed out that a preoccupation with biological parents' rights often ignores the child's essential rights to a permanent parental home. Ketcham and Babcock, Statutory Standards for the Involuntary Termination of Parental Rights, 29 Rutgers L.Rev. 530, 535-40 (1976); In re Jennifer "S", 69 Misc.2d 942, 330 N.Y.S.2d 872, 876-77 (Sur.Ct. 1972); Lloyd v. Schutes, 24 Md. App. 515, 332 A.2d 338 (1975); In re Lutheran Children & Family Services, 456 Pa. 429, 321 A.2d 618 (1974).

Moreover, the notion that a child should have a right to remain with adults with whom he has formed strong emotional bonds is not new. Over a century ago the Massachusetts Supreme Judicial Court stated:
If by misfortune, the child has made new relations in life, so deep and strong as to change its whole nature and character, the father has no right to reclaim it... . The child is not the father's property. It is a human being and has rights of its own... . If the father has left the child at an age too early for it to remember him, ... and other persons have expended money and become attached to the child, and the child has formed such associations as cannot be severed without injury to it, then the father has no legal right to sunder those ties.
In re Jerremiah O'Neal, 3 Am.L.Rev. 578, 580 (1868-69), quoted in Statutory Standards for the Involuntary Termination of Parental Rights, 29 Rutgers L.Rev. 530, 537 n. 47.
[12] Arkansas and Indiana also have modified versions of the Act's provisions: Ark.Stat.Ann. § 56-207 (Supp. 1979); and Ind. Code Ann. § 31-3-1-6 (Burns 1980). Other states have enacted the Uniform Adoption Act without modifications.

Alaska is not among those states whose approach to allowing stepparent adoptions without the noncustodial natural parent's consent emphasizes the best interest of the child. Indeed, this court has repeatedly ruled that a child's best interest is not relevant to a determination of whether a noncustodial natural parent's consent is unnecessary. D.L.J. v. W.D.R., 635 P.2d 834 (Alaska 1981); Adoption of L.A.H., 597 P.2d 513 (Alaska 1979); Adoption of K.S., 543 P.2d 1191 (Alaska 1975). Many other states, however, have taken a different position and favor considering the child's best interests. See, e.g., Ariz. Rev. Stat. Ann. § 8-106 (West Supp. 1980-81); Conn. Gen. Stat. Ann. § 45-61F(d) (West Supp. 1980); D.C. Code Ann. § 16-304 (1973); Idaho Code §§ 16-1504, 16-2005 (1979); Md. Ann. Code art. 16, § 74 (1981); and Mass. Gen. Laws Ann. ch. 210, § 3 (West Supp. 1981). See also Comment, A Survey Of State Law Authorizing Stepparent Adoptions Without The Non-Custodial Parent's Consent, 15 Akron L.Rev. 567, 577-79 (1982).
[13] Uniform Adoption Code § 6, 9 U.L.A. 26 (Amended 1971).
[14] R.N.T. v. J.R.G. & M.I.G., 666 P.2d 1036 (Alaska 1983); D.L.J. v. W.D.R., 635 P.2d 834 (Alaska 1981); Matter of Adoption of K.M.M., 611 P.2d 84 (Alaska 1980); Matter of Adoption of A.J.N., 525 P.2d 520 (Alaska 1974).
[15] Uniform Adoption Act § 6 commissioner's note, 9 U.L.A. 27 (1979).
[16] As for the dissent's suggestion that J.B. was actually kept from having contact with the boy, see footnotes 4, 5, 22 and 23 of this opinion.
[17] See, e.g., Pender v. McKee, 266 Ark. 18, 582 S.W.2d 929, 935-36 (1979); Woodruff v. Keale, 64 Hawaii 85, 637 P.2d 760, 766 (1981); In re M.D.A., 427 So.2d 1334, 1336 (La. 1983).
[18] AS 25.23.050 clearly differs from several other states' statutes that do specify that the 12-month period must immediately precede the filing of the adoption petition. See Oregon Revised Statute 109.324 and Wyoming Statute § 1-22-110(a). Moreover, the Alaska Legislature declined to carry over the phrase "prior to the filing" from the former statute, AS 20.10.040. A strict construction of the controlling statute's language clearly precludes us from going along with the dissent's desire to rewrite the statute to favor biological parents who might have "a change of heart" after years of significant nonsupport.
[19] Even if we were to pretend that the garnished $1,000 was voluntary support, the fact would remain that during the period from June 1982 through October 1983 J.B. owed $3,600 for the boy's support, but he significantly failed to pay $2,400 of that amount. During this prolonged period of well over one year, J.B.'s unjustified failure to provide two-thirds of the necessary support cannot be considered insignificant. The controlling statute, AS 25.23.050, clearly states that a parent loses the right to withhold consent to adoption if there has been a 12-month period of significant and unjustified nonsupport, as in J.B.'s case.
[20] See also Henson v. Money, 273 Ark. 203, 617 S.W.2d 367, 368 (1979):

[R]esumption of support payments, whether before or after a petition for adoption has been filed, will not act to "redeem" the delinquent parent and start a new one-year period under the statute.
[21] If, for instance, four years ago a parent significantly failed to support a child for a year, but thereafter (for the next three years) fully supported the child until the filing of an adoption petition, a court should find that that parent had not waived his or her right to withhold consent to the child's adoption. Although the dissent labels our position "harsh," this opinion actually considers the broader picture of the problems posed and recognizes that a child needs regular support (and meaningful communication) in the here-and-now. A young child's needs cannot be put on hold for years until a parent might have a "change of heart."
[22] For a much longer period, beginning while J.B. was still married to B.J., he reportedly had minimal contact with the boy. The evidence supports the guardian ad litem's conclusion that J.B. had "ignored" the boy for much longer than the minimum period specified in AS 25.23.050(a).
[23] This principle applies with equal force to the noncustodial parent's duty to meaningfully communicate with his or her child. Here, if J.B.'s ex-wife resisted his attempt to visit with the boy in August 1983, J.B.'s remedy lay in taking legal action against his ex-wife for violating his visitation rights as specified in their divorce decree. Notably, J.B. admitted at trial that he had not been kept from seeing the boy. Moreover, J.B.'s assertion as to his ex-wife's resistance to his sudden request to take the boy for weekends of unsupervised visitation in August 1983 has no bearing whatsoever on his significant failure to provide support for the period from June 1982 through October 1983. Nor does his contention counter the fact that he made virtually no effort to communicate with the boy from April 1982 to August 1983, despite his ex-wife's requests that he do so.
[24] In Matter of Adoption of K.M.M., 611 P.2d 84, 87-88 (Alaska 1980), we stated that we construe the adoption-consent provisions "strictly" in favor of a "natural" parent. However, a strict construction of AS 25.23.050(a) does not favor the nonsupportive or noncommunicative parent. A strict reading of the statute indicates that the legislature was raising, not lowering, the standard of conduct required of a noncustodial parent. To retain the right to block an adoption the parent must communicate "meaningfully", not perfunctorily, with his or her child; and nonsupport need not be absolute  it need only be "significant"  to obviate the need for the noncustodial parent's consent to an adoption.
[1] Despite the references in the majority opinion to the father's failure to communicate with his son, Majority Op. at 953, 955, 956), this case does not involve application of subpart (A) of the statute, relating to an unjustified significant failure to communicate. The master found that the mother, for a period of nearly a year before the petition for adoption, had interfered with communications between father and son so that the father's lack of communication had not been proven to be unjustified. This finding is not challenged on appeal.

The trial court's finding is amply supported by the testimony of the mother that she refused visitation between father and son when it was requested in January of 1983 and suggested instead that the father write letters to the son. The father did so, but to no avail because the mother did not read the letters to the son or let him know that they had been sent. After a series of further visitation refusals the father in September of 1983 filed a motion to enforce his visitation rights. Specific visitation was ordered by the court on November 23, 1983, but the mother refused to comply with the order. She did not permit visitation until after the petition for adoption was filed.
[2] In Hawaii, one of the three jurisdictions relied on by the majority, the harshness of the "any year" rule is tempered by the judicially imposed "settled purpose" doctrine which requires as a condition to the loss of parental rights a settled purpose on the part of the parent to abdicate his parental rights. Woodruff v. Keale, 64 Hawaii 85, 637 P.2d 760, 767 (1981). This condition could not be met in this case as the father was actively engaged in litigation to enforce his visitation rights when the adoption petition was filed.
[3] provision of the act ... which alludes to "twelve months or longer" transpiring subsequent to the entry or order requiring the father to pay a specified sum for the support of the children can "in the light of reason" be construed to mean twelve months immediately preceding the filing of the proceeding to adopt the minor child.
Sale v. Leachman, 131 S.E.2d at 188.
[4] statute here construed imposes a harsh and severe penalty upon the father not abiding by and obeying the mandate of a decree or order previously entered requiring him to pay a designated amount periodically for the support of his minor children. The penalty is to take from his bosom his own children, blood of his blood and bone of his bone, and without his consent give them to another. Our laws abhor penalties and forfeitures, ... and a law imposing a penalty must be strictly construed.
Sale v. Leachman, 131 S.E.2d at 188 (citations omitted).
[5] statutes are strictly construed in favor of maintaining the rights of natural parents in controversies involving termination of the parent-child relation, and especially is this true in those cases where it is claimed that by reason of a parent's failure to fulfill parental obligations as prescribed by statute, his consent to the adoption is not required.
... .
If the statute were construed to mean that any two-year period in which a parent failed or refused to assume parental duties was sufficient to dispense with consent, a parent, who through a change of heart or circumstances had attempted to reassume such duties after the two-year period, would be placed in the difficult position of proving there had been in fact repentance. While there appears to be authority permitting a repentant parent to show a resumption of parental obligations and thus reacquire the right to object to adoption, we believe that by limiting the two-year period of consideration to that next preceding the filing of the petition a natural parent is placed in a more advantageous position to uphold his rights. In other words, the fulfillment of parental duties and obligations is, in our thinking, more accurately gauged by the facts found to exist during the two-year period next preceding the initiation of the adoption proceedings.
In light of the foregoing rules of statutory construction, and the inclination of the court to uphold the rights of the natural parents, we are of the opinion that it was reasonably intended by the legislature that the failure or refusal to assume the duties of a parent for two consecutive years as provided in K.S.A. 59-2102(3) refers to the period next preceding the filing of a petition for adoption.
In re Adoption of Sharp, 419 P.2d at 814-15 (citations omitted) (emphasis in original).
[6] "[T]he purpose of the waiver-of-consent statute was to provide an objective measure of when a parent has, in the practical sense, forsaken a child." Majority Op. at 954 (emphasis in original).
[7] No guidance is given as to what is and is not important in reviewing a parent's entire history of support. We can not look to the decisions of courts in other jurisdictions interpreting similar statutes, because no other court, so far as I am aware, has taken such an approach. The majority opinion tells us on the one hand that "resumption of support payments ... before ... a petition for adoption is filed, will not act to `redeem' the delinquent parent and start a new one-year period... .", Majority Op. at 955 n. 20, quoting Henson v. Money, 273 Ark. 203, 617 S.W.2d 367, 368 (1979), while on the other hand, resumption of support payments for three years after a one year period of non-support means that the parent "had not waived" his right to withhold consent. Majority Op. at 955 n. 21. The terminology is inconsistent. There can be no doubt but that if a petition for adoption had been filed immediately after the last of twelve monthly payments had been missed in the example given above, waiver by any reading of the statute would have to be found. It is not possible, therefore, to say after the three years of faithful support which follow that there has never been a waiver. It is possible to say that the waiver has been cured by subsequent conduct, and that is what the majority must mean. What that conduct is will be the subject of much future litigation.
[8] Mann v. Garrette, 556 P.2d 1003 (Okla. 1976); Leithold v. Plass, 505 S.W.2d 376 (Tex.Civ.App. 1974).
[9] Haynes v. Mangham, 375 So.2d 103 (La. 1979) ($1200 payment on $4800 annual obligation barred application of statute); In re May, 441 So.2d 500, 505 (La. App. 1983); In re Adoption of Broussard, 469 So.2d 454, 456 (La. App. 1985).